Karol COSSAIRT and Gloria Cossairt, his wife, Appellants,

v.

Marie REICH and Frue Reich, Respondents,

M. F. A. Mutual Insurance Company, Respondent.

No. 49746.

Supreme Court of Missouri,

Division No. 2.

Sept. 9, 1963.

Green & Green, H. D. Green, West Plains, for appellants.

R. D. Moore, A. W. Landis, West Plains, for respondents.

STOCKARD, Commissioner.

This is a suit by the purchaser for specific performance of a contract for the sale of

real estate. From an adverse judgment plaintiffs have appealed. Title to real estate is involved within the meaning of Art. V, § 3, Constitution of Missouri, V.A.M.S. Barr v. Snyder, Mo., 294 S.W.2d 4.

In June 1961 respondents Frue Reich and his wife Marie Reich listed their 334 acre Howell County farm for sale with the United Farm Agency at West Plains, Missouri, of which Jack Sayre was agent and Charles Franks was salesman. Associated with Mr. Sayre was his wife, Marie Sayre, who was licensed as a real estate agent. The terms of the listing included the requirement that one half of the purchase price, or $10,000, be paid at the time of the sale. The method of and time for payment of the balance was to be arranged. Shortly thereafter Frue Reich went to Idaho to work. In the early part of July Mr. Sayre showed the Reich farm to Mr. and Mrs. Karol Cossairt, residents of Indiana, and a proposed contract of sale was drawn by Charles Franks on terms requested by the Cossairts which were different from those in the listing in at least two respects. Pursuant to this proposed contract the buyers were to receive one half the corn crop, and instead of a down payment of $10,000 the buyers would pay $3,000 and assume a $7,000 F.H.A. mortgage. Mrs. Reich was contacted, and a telephone call was made to Frue Reich at Rupert, Idaho. According to Mr. Reich, Mr. Franks told him that he had "what you want" in a purchaser except that as part of the transaction he wanted one half of the corn crop. According to Mr. Franks he told Mr. Reich that he had an offer of "$20,000; $3,000 in cash down, assume F.H.A. loan and him to carry the balance at $2,000 a year including six per cent interest," but there was no discussion about the purchaser assuming the mortgage. Mr. Franks further testified that he read the proposed contract over the telephone, but Mr. Reich denied this. Mr. Reich refused to include one half of the corn crop in the sale. During the conversation he told his wife that if she could get $10,000 down she should sell the farm; otherwise she was not to sell. The following day, which apparently was July 6, Mr. Sayre and Mr. Franks went to Mrs. Reich and offered to reduce the real estate commission from $2,000 to $1,500 (the commission was 10% of the sale price) if the sale could be completed with the purchaser receiving one half of the corn crop. This would have resulted, in effect, in Mr. and Mrs. Reich selling one half of the corn crop for $500. Without reading all of the proposed contract of sale and without again calling Mr. Reich, Mrs. Reich signed the proposed contract and placed her husband's name on it. No issue is made concerning her authority to do so.

There is no question but that both Mr. Sayre and Mr. Franks knew and understood that Mr. and Mrs. Reich wanted to receive $10,000 as a down payment, and that the listing called for such payment. Mr. Franks said he drew the proposed agreement and that he knew it was not drawn according to the terms of the listing. Mr. Sayre's position was that in his opinion the payment of $3,000 down and the assumption by the purchaser of the $7,000 F.H.A. mortgage constituted "paying half down." Mrs. Reich testified that when Mr. Sayre and Mr. Franks came to see her on July 6, Mr. Sayre asked her if what she and Mr. Reich wanted was to pay off the F.H.A. loan and then take a first mortgage and she said it was. However, Mr. Sayre made no explanation to her of what was meant by the purchaser assuming the F.H.A. mortgage, and Mr. Franks testified that the meaning of this provision was not discussed because she did not "question what 'assume' means." When asked on cross-examination who was to carry the first mortgage, Mr. Sayre said "there wasn't to be any first mortgage. It was to be sold on a contract for a deed." What he meant by this is not clear because the F.H.A. mortgage would have constituted a "first mortgage" even if no second mortgage was to be given. The terms of the contract of sale are equally confusing. It was there expressly provided that "all deferred payments, not already secured by

deed of trust or mortgage, are to be evidenced by note or notes signed by second party [the Cossairts], secured by mortgage or deed of trust on said real estate with interest from date of deed at the rate of 6% per annum," and that "on receiving such payment" the sellers should "deliver, to said [buyers] * * * a proper deed containing a general warranty and the usual full covenants for the conveying and assuring to them merchantable title to said premises, free from all encumbrances except those mentioned herein." It is not clear what was meant by "such payment," but if there was to be a deed of trust executed by the buyers to the sellers, as the above language clearly provides, the reference must have been to the payment of the $3,000. However, at another place the contract provided that a "deed shall be delivered" on October 5, 1961 "at the office of the 1st National Bank in the City of West Plains, Mo." It did not state to whom delivery was to be made or for what purpose, and there was no escrow agreement in the contract.

About two weeks after Mrs. Reich signed the contract of sale she first received a copy of it, and after reading it and perhaps receiving legal advice as to its effect and meaning, but this is not clear, she notified Mr. Sayre and Mr. Franks that it was not drawn up the way she and her husband had wanted it. Mr. Sayre told her, according to Mrs. Reich, that she was getting upset over nothing. That weekend she called her husband in Idaho, and he then called Mr. Sayre and told him that the contract was not drawn the way he had understood it, and that he was not going to sell the property.

On September 18 there was another telephone call made to Frue Reich. Present at the West Plains end of the conversation were Mr. Franks, Mr. and Mrs. Sayre, Mr. and Mrs. Cossairt and Mrs. Reich. This telephone conversation lasted almost an hour, and there is much dispute in the testimony not only as to the subject matter of the conversation but as to what was said.

According to Mr. and Mrs. Reich they were protesting the entire transaction. Mrs. Reich told her husband that "they are all jumping on me," and there was testimony to the effect that Mr. Sayre was threatening to sue the Reichs if they did not go through with the sale, that some threat or statement was made that Mrs. Reich "could be gotten for forgery," and that Mrs. Reich was upset and crying. Mr. Franks testified that "I told him [Mr. Reich] that she [Mrs. Reich] signed the contract and both sides were expected to live up to it just the same," apparently referring to the fact that. Mr. Reich told him that "he didn't like what was going on." According to Mr. Sayre, however, the entire conversation pertained to a proposed change in the date for the purchasers to take possession. He said that he knew of no misunderstanding about the terms of the contract of sale. Notwithstanding the admitted terms in the listing, and that he attempted to justify the terms of the contract on the basis that it did in fact provide for a down payment of one half the purchase price, he testified that Mrs. Reich never told him that she and her husband wanted one half of the purchase price as down payment. He also testified that during the telephone conversation Mrs. Reich did not cry, that there was no threat of a lawsuit, and that he knew nothing about a threat of a charge for forgery. However, Mr. Franks admitted that forgery "was mentioned at one time" during the telephone conversation. In any event, after this telephone conversation was concluded, Mrs. Reich signed her name and that of her husband to a handwritten statement wherein it was provided that they agreed to give possession of the 334 acres of land by December 1, 1961, and give possession of the house by October 5, 1961. She testified that she did so because after the long telephone conversation her husband said it "looks like we are being took. I am out here and you are there and there is nothing else we can do."

Following this telephone conversation of September 18, Mr. Sayre had Mr. E. V.

Kell, an attorney, draw up a new contract of sale, which appellants say in their brief was "in conformity with the agreement had." It is a well drawn instrument which sets forth concisely its terms, but we need not set them forth or comment on them. When this new contract was sent to Mr. Reich he signed it and returned it to his wife. On his instructions she then took it to Mr. A. W. Landis, an attorney, and when advised by him that it did not provide for a first mortgage to be given to the sellers she "struck the names off the copies" and instructed Mr. Landis not to deliver the contract and it was not delivered.

There was evidence that Mr. Cossairt had not applied to the F.H.A. to be permitted to assume or take over the $7,000 F.H.A. mortgage. Whether Mr. Cossairt would, on application, be permitted to assume the F.H.A. mortgage would depend upon approval by the "county committee." At the trial Mr. Cossairt indicated he would borrow the money from other sources, without specifying them, if necessary.

On April 17, 1962 the Cossairts filed a "supplement" to their petition in which they alleged that after this suit was filed the house on the property was destroyed by fire, and that the M.F.A. Insurance Company insured the dwelling for approximately $5,000. They also moved that the M.F.A. Insurance Company be made a party defendant, and such motion was granted. Apparently the insurance money received or to be received has been or will be applied to reduce the note secured by the F.H.A. mortgage. Appellants do not advise us what they think should be the order of this court in relation to this $5,000 in the event they should be found to be entitled to specific performance.

Appellants pleaded both contracts in their petition, but not in the alternative. For the reasons previously set forth concerning the second contract, if appellants are entitled to the relief sought it must be by reason of the contract dated July 5, 1961. The trial court did not make findings of fact and conclusions of law; it merely found "the issues for the defendants" and that "under the evidence the plaintiffs are not entitled to the relief sought on said petition."

In this equitable proceeding we review the case de novo and determine the credibility, weight and value of the testimony and evidence, and we arrive at our own conclusions based on the entire record. Durwood v. Dubinsky, Mo., 361 S.W.2d 779, 787. However, in doing so we give due deference to the findings and conclusions of the trial chancellor who had the opportunity in reconciling conflicting testimony to see and hear the witnesses and thereby judge their credibility. In such case the judgment of the chancellor "will be sustained unless the proof is palpably insufficient in clarity and cogency to warrant the finding made by him." City of Warsaw v. Swearngin, Mo., 295 S.W.2d 174. See also Ethridge v. Perryman, Mo., 363 S.W.2d 696.

Mrs. Sayre and Mr. Franks both testified that in handling this transaction they were acting as the agents for Mr. and Mrs. Reich who were to pay the commission of 10% of the sale price, and they testified that they were also acting as the agents of Mr. and Mrs. Cossairt. According to Mrs. Sayre she was representing the interests of both the buyers and sellers at the same time, and she was not representing exclusively the interests of Mr. and Mrs. Reich. This case demonstrates most vividly the dangers and inadvisability of such dual agency and divided loyalty.

Mrs. Sayre and Mr. Franks admit that the contract of sale dated July 5, 1961 was not drawn according to the terms of the listing made by Mr. and Mrs. Reich, but that it was drawn according to the instructions of Mr. Cossairt. However, when Mr. Sayre and Mr. Franks took the contract to Mrs. Reich they made no explanation to her of the change or its effect, and according to Mr. Reich when he was called on the telephone he was told that they had a purchaser exactly as they wanted except

that he wanted to receive one half of the corn crop free. While there was a dispute in the evidence as to what Mr. Franks told Mr. Reich over the telephone, the conclusion that Mr. Reich was led to believe that the inclusion of one half of the corn crop was the only change is borne out in some respects by the assertions of Mr. Sayre that the proposal that the buyers pay down $3,000 and assume the F.H.A. mortgage amounted to a down payment of one half of the purchase price. If this were true no explanation except as to the corn crop was necessary or required, and we conclude that none was made. However, Mr. Sayre obviously was wrong. The contract as drawn did not call for payment of one half of the purchase price, and it resulted in the Reichs receiving a second mortgage to secure the balance of the payment, or in receiving or retaining some other interest subject to the F.H.A. mortgage. But, it is obvious, and it should have been obvious to Mr. and Mrs. Sayre and to Mr. Franks, that the Reichs intended to use the $10,000 to pay the real estate commission and pay off the F.H.A. mortgage and then take a first mortgage from the buyers to secure the payment of the balance. We do not imply that the parties could not change the terms of the listing, or that it was not proper for the real estate agents to attempt to find terms agreeable to both parties. However, the change in the contract in this case, made without a full and complete explanation to both Mrs. Reich and her husband, resulted in them receiving less under the contract than they intended or expected to receive.

The trial court commented that it considered Mrs. Reich an "inexperienced woman." It had the opportunity to hear and observe her during trial, and the record tends to support that conclusion; at least it is not contrary thereto. We find nothing in the record to indicate that Mr. and Mrs. Sayre or Mr. Franks advised the Reichs or either of them, that their loyalty to them was to be divided or lessened in the handling of this transaction. Under the circumstances we have outlined we conclude

that those in whom Mr. and Mrs. Reich placed their confidence and had employed in consideration of a fee to represent their interests, took an unfair advantage of Mrs. Reich and foisted upon her and upon Mr. Reich a contract of sale contrary to what they wanted, and contrary to what they were led to believe the contract provided. In doing so, they breached their duty to Mr. and Mrs. Reich, and while doing so they were by their own admissions acting as the undisclosed agents of the Cossairts, who were adversaries in interest to the Reichs.

Specific performance is not a matter of right, but is a remedy applied by courts of equity depending upon the facts of each particular case. The chancellor has judicial discretion, within the established doctrines and principles of equity to award or withhold the remedy. Cummins v. Dixon, Mo., 265 S.W.2d 386, 47 A.L.R.2d 441; Miller v. Coffeen, 365 Mo. 204, 280 S.W.2d 100; Robert Blond Meat Company v. Eisenberg, Mo., 273 S.W.2d 297. This discretion is properly exercised against specific performance when the contract was induced by some sharp practice, misrepresentation or mistake, Landau v. St. Louis Public Service Company, 364 Mo. 1134, 273 S.W.2d 255, 48 A.L.R.2d 1200, or when it is incomplete, unfair, or overreaching, or when there are present elements of mutual mistake in matters of substance, covetous contrivances, fraud, imposition or the like. Miller v. Coffeen, supra. Not all of these conditions exist in this case, but we are convinced that the contract was induced by a misrepresentation made in breach of a confidential relationship, and that as a result the contract is unfair and overreaching. It may be argued that the wrongful conduct was not the act of the appellants, and they should not be punished for the wrongful conduct of others. We do not rule, on the evidence before us, that appellants knowingly participated in the misrepresentation, but the contract they are seeking to enforce is tainted with misrepresentation on the part of persons who by their

own admission, and without denial on the part of appellants, were acting as their agents. If appellants have been damaged thereby let them seek their legal remedy against those who have wronged them.

We conclude that in this case, in view of the facts and circumstances we have outlined, the trial court did not abuse its judicial discretion in refusing specific performance. In fact, we are of the opinion that under the circumstances the exercise of sound judicial discretion requires that specific performance be denied, and that the parties should be left to their legal remedies, if any.

The judgment is affirmed.

BARRETT, C., concurs.

PER CURIAM.

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All of the Judges concur.