**Weldon J. ZOELLNER and Alice Davidson, Plaintiffs-Appellants,**

v.

**H. M. CARTY and Louella M. Carty, Defendants-Respondents.**

**No. KCD 29865.**

Missouri Court of Appeals, Western District.

July 31, 1979.

Rollin J. Moerschel, Niedner, Moerschel, Ahlheim & Bodeux, St. Charles, for plaintiffs-appellants.

R. E. Moulthrop, Jr., Bethany, for defendants-respondents.

Before SHANGLER, P. J., SWOFFORD, C. J., and WASSERSTROM, J.

SWOFFORD, Chief Judge.

This is an action in equity wherein the appellants (buyers) brought suit against the respondents (sellers) for specific performance of a real estate sales contract involving approximately 800 acres of farmland in Grundy County, Missouri. After the evidence was heard by the court below, a decree was entered wherein the trial court, sitting as a chancellor in equity, found that the real estate contract was a valid and binding contract but denied relief for the reasons of the advanced age of the seller, H. M. Carty, the lack of business experience of his wife, Louella Carty, and the fact that under the terms of the contract the possibility of completion thereof was extended for 20 years with payments thereunder contingent upon future events and prices. The court found that by reason of these facts the contract was unreasonable and unfair, declined relief, and left the buyers to their remedy at law for breach of contract and damages, if any. This appeal followed.

The appellants-buyers raise a single point on this appeal. They assert that the trial court erred "in Denying Specific Performance of the Real Estate Sale Contract on the Grounds Said Contract is Unreasonable and Not Fair to Sellers". This point is not in compliance with the requirements of Rule 84.04(d), but since respondents raise no objection upon that basis, it will be considered as placing in issue on this appeal the sufficiency of the evidence to support the decree.

A review of this type of equity action, under this presentation, would seem to throw open the floodgates to a broad and limitless scope of scrutiny by this Court. However, such is not the case since that review is closely limited and defined by binding decisional case law and generally accepted text law in Missouri.

■ The law is clear that a decree of specific performance is not a matter of right even to enforce the terms of a legal and binding contract. Rather, it is a matter of grace resting upon basic equities and residing within the sound discretion of the chancellor, depending in the last analysis, upon the facts of each particular case. *Cossairt v. Reich,* 370 S.W.2d 291, 295[3] (Mo.1963); *Miller v. Coffeen,* 365 Mo. 204, 280 S.W.2d 100, 102–103[3–6] (Banc 1955); *Landau v. St. Louis Public Service Co.,* 364 Mo. 1134, 273 S.W.2d 255, 259[8–12] (Banc 1954).

■ The authorities have further delineated criteria for the exercise of the court's discretion in this class of case. Such may be properly exercised where the contract is induced by some sharp practice or where it is "unfair, overreaching or biting", or where there are present elements of covetous contrivance or imposition. *Cossairt v. Reich,* supra, at l.c. 295[4]; *Likens v. Sourk,* 263 S.W.2d 462, 465[4] (Mo.App.1953); *Ensign v. Home for the Jewish Aged,* 274 S.W.2d 502, 508[7] (Mo.App.1955).

This general rule is stated in 81 C.J.S. Specific Performance § 20a, pp. 737–739:

"Specific performance of a contract is never decreed when its enforcement would be inequitable or unconscionable, or produce injustice or hardship or where the specific performance of the contract would operate oppressively as to either party, even though there is no sufficient ground for rescission or cancellation."

In *Likens v. Sourk,* supra, at l.c. 465[5–6], the court said:

" * * * The criterion by which a contract is judged, as to ordering its specific performance, is not whether a court would be justified in its rescission, or in refusing other forms of relief, but whether it would be inequitable to enforce the contract. * * * "

■ Upon review of the trial chancellor's decree in this equity proceeding, traditionally due deference must be given to the trial court's opportunity to see and hear the witnesses and to judge their credibility and to reconcile conflicts in the testimony. Rule 73.01(3)(a), (b).

Since the decision in *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976) the scope of review in such cases has been even further limited. In that case, Rule 73.01 was declared to mean that the judgment in court-tried cases should not be set aside on review (even in cases on the law side which the Rule stated "shall be reviewed upon both the law and the evidence as in suits of an equitable nature") unless, a) there is no substantial evidence to support it; b) it is against the weight of the evidence; c) unless it erroneously declares the law, or, unless it erroneously applies the law. The power to set aside a judgment on the ground that it is " 'against the weight of the evidence' ", *Murphy* further declares, should be exercised with caution and with a firm belief that the decree or judgment is wrong, and that the use of the traditional words "de novo" and "clearly erroneous" is no longer appropriate in review of a court-tried case. *Murphy v. Carron,* supra, at l.c. 32[1–3].

■ In the light of these principles the record has been carefully reviewed and it discloses that the following facts are supported by competent and substantial evidence:

At the time of the events here involved the respondents were husband and wife and were the owners and operators of a farm in Grundy County, Missouri consisting of approximately 1163 acres. H. M. Carty was 75 years of age and so hard of hearing as to be virtually deaf. His wife, Louella, was 55 years of age and was a farm housewife with no business training or experience. The Cartys in 1976 were interested in selling that part of their farm described as

lying east of a public road that divided their farm, which contained approximately 800 acres of land. The crop farming on this part of the farm was done by a tenant on 50% shares and the testimony established that the share realized by the Cartys on the 800 acre tract (of which approximately 600 acres was in crops) for the year 1975 was $29,233.96 and for the year 1976 was $24,-062.13. The crops raised were corn and soybeans. At the time of the negotiations here involved there was a first mortgage-deed of trust on the entire Carty farm held by the Phoenix Mutual Insurance Company of Iowa with an unpaid principal balance of $139,000.00. The primary reason that the Cartys wished to sell the 800-acre tract was to convert their equity therein to an interest bearing note secured by a first deed of trust on the land, as income.

Mr. A. R. Hammett was engaged in the real estate and insurance business, lived on a farm east of Trenton, and had been a friend of the Cartys for a number of years. He learned of the Cartys desire to sell the 800-acre tract and communicated this fact to his daughter, Alice Davidson, one of the appellants herein, who lived in St. Louis County and was an independent real estate broker in the office of Zoellner. She, in turn, communicated this fact to Weldon J. Zoellner, the other appellant, who was also a resident of St. Louis County and was engaged in the real estate business. Zoellner had apparently previously made inquiry of Mrs. Davidson if she knew of any farm property for sale.

As a result of these contacts, Zoellner, Davidson, Hammett and the Cartys met at Trenton, Missouri on June 2, 1976. At this meeting, Carty took the others to view the farm and placed a price on it of $600,000.00. A general discussion was had with particular emphasis on the tax consequences of such a sale, but no definite agreement or contract was reached. The Cartys were to confer with their tax accountant, which apparently they did, and thereafter, a meeting was arranged for Chillicothe, Missouri between the parties, Hammett and the tax accountant for June 16, 1976.

On that date the parties met at a bank in Chillicothe and Carty advised them that he was not satisfied with his accountant's advice and did not want him to participate in the conference. Hammett, thereupon, went to the accountant's office, so advised him, and paid his charges. The group thereupon adjourned to the hotel and Zoellner presented to the Cartys a written contract. Some revisions were agreed upon, which Mrs. Davidson wrote into the contract and it was signed. However, this contract was later destroyed. It is not the contract here sought to be enforced by specific performance and a copy of it is not a part of this record, so its exact terms do not appear.

On July 13, 1976, Zoellner and Davidson and their spouses and Hammett went to the Cartys home and the contract here involved was executed. It is worthy to note that although executed on July 13, 1976, it is dated June 16, 1976, and it was notarized in St. Louis County on July 13, 1976. On July 22, 1976, Hammett called his daughter, Mrs. Davidson, and advised her that the Cartys no longer wanted to go through with the deal. On August 2, 1976, Mrs. Davidson caused the contract to be recorded on the land records in Grundy County. According to the contract, the sale was to be closed on November 1, 1976 and the appellants and their spouses and Hammett, after waiting most of the day for the Cartys at the abstract company at Trenton, Missouri, were advised by the Cartys late that afternoon at that company's office that they would not execute the closing papers. This suit was filed November 8, 1976. At no time during all of these meetings and negotiations were the Cartys represented by legal counsel.

The contract here sought to be enforced by specific performance provided for a sales price of $570,000.00. The parties agreed that the value of the property was $600,-000.00 but since Zoellner and Davidson agreed to pay Hammett his commission of $30,000.00 the contract price was fixed at $570,000.00.

Subject to the appellants-buyers' ability to secure a loan of $300,000.00 at 9¾% interest, the contract provided that they were to

pay the existing loan balance, an encumbrance on the whole Carty farm of $139,000.00 (a figure employed in both briefs and in most of the testimony); to give their note secured by a second deed of trust on the 800-acre parcel at 8% interest in the amount of $400,000.00; and, to pay the Cartys $31,000.00 in cash on January 5, 1977 toward the purchase price. The evidence showed that the appellants-buyers had in fact secured such a commitment from Phoenix Mutual (the holder of the old loan) and its farm loan manager testified that his company was ready to close this whole loan transaction on November 1, 1976. Such loan arrangement would leave a balance of $130,000.00 in cash from the proceeds of the new loan for Zoellner-Davidson or $100,000.00 if Hammett's commission was to be paid from such funds. Their only out-of-pocket expense was a $100.00 "earnest money" deposit placed in escrow with Hammett when the contract was signed, which he still held in escrow at the time of trial approximately a year later.

The contract provided that the income from the purchasers' share of the farm crops "in the year received shall be the sole source of the retirement of all debts" and was to be allocated and dispersed in the following order: 1) principal and interest on the $300,000.00 first mortgage held by Phoenix Mutual; 2) real estate taxes; 3) seed, fertilizer and chemicals for the following year's crops; 4) interest payment on the $400,000.00 second mortgage owned by the Cartys; 5) 50% of any remainder to go toward the principal of the second mortgage, and, 50% thereof to be retained by the owners of record; and 6) if the income was not sufficient to pay interest on the balance of the second mortgage the deficit was to be added to the principal.

The contract gave the Cartys the right after five years to call for payment in full "provided loan is obtainable by Purchaser at market rate". The promissory note for $400,000.00 prepared for the closing of the deal provided that the unpaid balance thereof was absolutely due on October 31, 1996, 20 years after its date.

The evidence disclosed that the appellants intended to operate the farm on a share crop basis with the tenant who was then working with the Cartys, so that they would realize one-half of the profit from the crops each year. There was positive testimony that upon this basis of operation the Carty share in 1975 was $29,233.96 and in 1976 was $24,062.13, which testimony was obviously accepted by the trial chancellor. The appellants offered the calculations of Mrs. Davidson that the crop yield from the corn and soybeans should produce net to the owners in the neighborhood of $50,000.00 to $60,000.00. All such figures were, of course, based upon many factors of speculative nature such as efficiency of operation, growing conditions, yields and market prices in any given year. The only solid evidence as to net income from the farm to the owners were the figures for 1975 and 1976. Such returns would be insufficient to pay even the interest on the $300,000.00 first mortgage proposed under the contract herein at 9¾% let alone whatever yearly principal payments were provided for on the Phoenix Mutual note. In addition, there was uncontradicted evidence that the real estate taxes were approximately $2200.00 per year and the cost of seed, fertilizer and chemicals ran from approximately $12,000.00 to $15,000.00 per year. Since the interest on the second mortgage of $400,000.00 at 8% would amount to $32,000.00 per year, it is obvious that even under the most optimistic view there was no possibility that these obligations could be paid and the encumbrance liquidated from the net proceeds for the owners' share of the crop income from the farm. Such a situation would leave the Cartys with a second deed of trust on property burdened by $700,000.00 in mortgages and with no reasonable or foreseeable opportunity to realize anything from their equity or their note, either principal or interest, for at least five years and more likely 20 years. After five years, if their note was not previously paid, their only recourse would be to put into the property a very substantial additional sum to retire the Phoenix Mutual obligation and then foreclose their second

deed of trust subject to the first loan. Obviously, this situation would defeat the Cartys clearly stated purpose, to turn their equity in the farm into an income-producing secured note. It needs no emphasis that in 5 years H. M. Carty will be 80 years of age and Louella Carty 60 years young. In 20 years, H. M. Carty, if living, would be 95 and Louella 75 years old. No doubt can exist that this contract, as drawn, read in the light of this record here and all surrounding circumstances is unfair, unreasonable, overriding and biting, *Likens v. Sourk*, supra; is likely to produce hardship and result in gross injustice, 81 C.J.S. Specific Performance, supra; and would operate oppressively as to the Cartys. In such a situation, the trial court, sitting as a chancellor in equity, properly declined the equitable relief of specific performance and no abuse of discretion appears. There was substantial evidence to support the decree, the decree was not against the weight of the evidence, and the decree did not erroneously declare or apply the law. This Court has the firm belief that the decree was proper. *Murphy v. Carron*, supra.

The judgment and decree is accordingly affirmed.

All concur.