Daniel G. KOPP and Lois M. Shufeldt, Plaintiffs–Appellants,

v.

Richard FRANKS and Faith Franks, Defendants–Respondents.

Daniel G. KOPP and Lois M. Shufeldt, Plaintiffs–Respondents,

v.

Richard FRANKS and Faith Franks, Defendants–Appellants.

Nos. 16406, 16420.

Missouri Court of Appeals, Southern District, Division Two.

July 5, 1990.

David F. Sullivan, Schmidt, Kirby & Sullivan, Springfield, for plaintiffs-appellants and plaintiffs-respondents.

Craig F. Lowther, Greggory D. Groves, Lowther, Johnson, Lowther, Cully & Housley, Springfield, for defendants-respondents and defendants-appellants.

SHRUM, Judge.

Plaintiffs Daniel G. Kopp and Lois M. Shufeldt, husband and wife, brought suit against defendants Richard Franks and Faith Franks seeking specific performance of a contract and damages for breach of the same contract. The contract provided that defendants were to build a home for plaintiffs for $210,000.00 on a lot selected by plaintiffs but purchased by defendants. Plaintiffs filed a lis pendens notice when they filed their lawsuit. Defendants counterclaimed seeking actual and punitive damages from plaintiffs for abuse of process in the filing of lis pendens. The trial court made detailed findings of fact and conclusions of law followed by judgment and order denying plaintiffs' claim for specific performance and attorney's fees. The trial court's judgment denied defendants' damage claim for abuse of process and defendants' claim for attorney's fees. Judgment for $13,176.78 was entered for plaintiffs, being a sum equal to the $13,000.00 down payment plus an additional $176.78 paid by plaintiffs for materials in the house.

Plaintiffs appeal from the judgment denying their claim for specific performance. Defendants cross-appealed from the denial of their abuse of process claim; denial of their claim for attorney's fees; and the judgment for $13,176.68. This court affirms.

Plaintiffs had long planned to build a home. After looking at homes built by defendants, the plaintiffs requested a set

of drawings from the defendants of one of defendants' "model homes." Plaintiff Lois Shufeldt made some changes in the floor plan and thereafter, on May 6, 1987, plaintiffs and defendants entered into a contract whereby defendants were to construct a residence as depicted on the plans and drawings for $210,000.00. Plaintiffs had chosen the lot before signing the building contract. Defendants paid $32,500.00 for the selected lot and took title in their name. Plaintiffs made a $3,000.00 down payment when the contract was signed, and pursuant to a provision of the contact, an additional $10,000.00 was paid by plaintiffs to defendants on May 22, 1987. The contract did not provide for the payment of any additional sums during the construction stage. Paragraph 8 of the contract read as follows:

> All increases in contract sum resulting from changes will be as agreed to by the parties hereto or will be the contractor's actual cost, to include a reasonable sum for Contractor time, additional interest and insurance if the change results in an increase in contract time, plus TWENTY PERCENT (20%). (Capitals in the original).

Construction started May 7, 1987, with the digging of the basement started on May 8. After construction started, plaintiffs requested changes in the work and plans. On June 30, 1987, during a walk-through, certain change orders were submitted to the defendants. Change order 3 added brick to the north wall; change order 4 added humidifiers to both furnaces; and change order 6 was an upgrading of the furnaces. When the change orders were presented to plaintiffs, they took issue with the additional 20 percent contractors' fee provided in paragraph 8 of the contract. After some discussion, the defendants agreed not to charge the 20 percent additional contractors' fee.

In July 1987, further disputes arose between the parties. Plaintiff Lois Shufeldt requested that "rosettes" (decorative wooden blocks) be installed on the corners of door frames for decorations, claiming that they had been promised, although not required by the contract. After a short dispute between plaintiff Lois Shufeldt and defendant Richard Franks, the defendants agreed to add them at no charge. The trial court observed that these were minor disputes in terms of cost but added to the friction between the parties.

Other sources of trouble arose in July from the fact that plaintiff Lois Shufeldt requested that a dormer above the garage be constructed with the same siding used on the rest of the house, although the specifications had called for redwood and the defendants had used redwood. Acceding to plaintiffs' request, defendants removed the redwood and replaced it with the cheaper siding that was on the rest of the house. The cost to the defendants in removing the redwood siding was approximately $300.00, which they did not charge to the plaintiffs.

Shortly after the rosettes issue, defendant Faith Franks asked plaintiff Lois Shufeldt to choose colors for the grout and formica, stain for the woodwork and cabinets, and hardware for cupboards and vanities. A walk-through for this purpose was suggested by defendant Faith Franks, but the walk-through did not occur. This became a source of controversy later when completion date issues arose.

The next dispute occurred over closet shelving and rods in the master bedroom. Plaintiff Lois Shufeldt claimed they were not done according to her specifications. Defendant Richard Franks reported that a change order and additional charge would be necessary to meet her demands, but later the defendant acknowledged that the contract did provide for what plaintiffs demanded and agreed to finish the closet to the plaintiffs' specifications.

The trial court noted in its findings of fact that it was apparent from the demeanor of plaintiffs and defendants during their testimony, that by the time of the closet dispute, the relationship had deteriorated substantially. Additional changes, which plaintiffs requested and defendants furnished without additional cost, included the substitution of a porcelain sink, as specified in the contract, with a more expensive

stainless steel sink. No charge was made by defendants to plaintiffs for that change. PVC pipe was placed under the driveway for a sprinkler system, which was an extra cost, and end panels were placed in the kitchen at an additional cost to defendants.

In August 1987, defendants referred plaintiffs to a carpet store to look for carpet material. While at the store, plaintiffs asked if the billing for the carpeting could be sent directly to them thereby saving plaintiffs the extra 20 percent on the overrun. If this could be accomplished, the material bill would not exceed the budget allowance or, at least, the defendants would not know the material exceeded the allowance. The carpet store owner, Terry Addington, not wishing to compromise his relationship with the defendants, refused to accept that arrangement without the defendants' permission. Defendants learned of the plaintiffs' attempt to obtain direct billing on the carpeting.

Another dispute, which added fuel to the fire, was plaintiffs' request that defendants build a brick mailbox. When it was found that subdivision restrictions would not allow such construction, plaintiffs requested a credit for the amount that the defendants saved by not having to build the mailbox, which defendants had already agreed to build without charge. The mailbox was not in the contract specifications and when plaintiffs demanded the credit, defendants became angry about the request. A similar request involved marble stool surrounds. Defendants agreed to build the marble stool surrounds at no extra cost even though not in the plans. When it was determined that the marble stool surrounds were not needed, plaintiffs made a claim on the defendants for a credit.

On August 17, 1987, the parties held another walk-through inspection. The trial court noted that the walk-through inspection proceeded without serious dispute, but it was obvious to the trial court that plaintiffs were dissatisfied with the speed with which the house was progressing and, further, plaintiffs had concerns about other aspects of the contract which they did not express to defendants. One such concern related to the fact that the contract called for textured ceilings but the plaintiffs wanted painted ceilings. Defendant Richard Franks had apparently told plaintiffs that painted ceilings would not cost more, but later defendant Faith Franks told them that painted ceilings would be 32 cents per square foot extra, plus the contractors' fee. There was evidence that 32 cents per square foot was a fair charge in the Springfield area. However, plaintiffs perceived this as an attempt to charge them unfairly, and it became a serious issue to the plaintiffs.

Status of the relationship between the parties worsened substantially during a telephone conversation on August 25, during which plaintiff Daniel Kopp accused defendant Richard Franks of trying to "screw" the plaintiffs and of trying to "cheat" them. During that telephone conversation, Daniel Kopp told defendant Richard Franks that he would "nitpick" the contract from then on and hung up on Richard. Additional conversations, on that date, were between plaintiff Lois Shufeldt and defendant Richard Franks.

On August 31, plaintiffs sent defendants a letter in which they complained about painting of the ceilings, water leaks in the master bedroom, cabinets in the basement, cost estimates of the finished project and the completion date. Plaintiffs complained in the letter that their loan approval was good only through October 15, 1987, and stated that, "We are also going to want to have the house inspected by a professional inspector as a precautionary measure and to *insure our complete satisfaction.*" (Emphasis added.) Defendants' reaction to the letter was that they had not agreed, nor contracted to build, a house to defendants' "complete satisfaction." Additional demands in the August 31 letter, which defendants contended were not required by the contract, included additional outside lights; additional loan application costs; and a request that plaintiffs be reimbursed for any additional temporary living expenses after October 15. The conclusionary remarks in the letter were: "We have been, for the most part, well pleased with the quality of the work completed."

Upon receipt of the letter, defendants changed the locks on the house on September 4. A meeting was arranged between plaintiffs and defendants for September 9. All of the parties attended the meeting. There was a dispute about what was said by the respective parties at the meeting. Defendant Richard Franks testified that he told the plaintiffs, "[H]e didn't want to finish the [contract]" and denied saying he would not finish building the house. The trial court accepted his version of the conversation. In that conversation, defendant Richard Franks suggested that plaintiffs might "buy him out" and finish the house themselves and, in doing so, "might be able to save some money." The trial court noted that plaintiff Dan Kopp, in his notes concerning this conversation, punctuated the phrase "might be able to save money" with three exclamation marks. There was also evidence that two other professors, who owned homes in the same subdivision, had bought out their contractors and hired a builder to finish the project.

On September 13, plaintiff Lois Shufeldt called defendant Richard Franks and told him to stop work on the house because plaintiffs were going to buy defendant Franks out. In keeping with that conversation, defendant Richard Franks furnished plaintiffs all the bills and invoices showing the amount of money the defendants had in the house to that date. The documents furnished plaintiffs by defendants showed that as of September 14, defendants had an investment in the project of $157,003.28.

From September 9 to October 12, work on the house was at a standstill. No progress was being made between plaintiffs and defendants in resolution of their disputes. The expenses of the project continued to accrue to the defendants. In late October 1987, defendants decided to finish the house to their own specifications and tastes, rather than the plaintiffs', in the belief that the home would be more marketable. In completing the home to their specifications, the defendants spent an additional $45,000.00 over and above the original items that were called for in the contract. Defendants claimed their motive in finishing the home to their specifications was to mitigate damages.

Estimates of the value of the completed house were as follows: (a) Janet Parsons, a professional appraiser, testified on behalf of plaintiffs the fair market value was $235,000.00 but that the house could not be built back for that figure. She testified that the home was a "very saleable home the way it was finished, and it was finished nicely, yes."; (b) plaintiff Lois Shufeldt believed the home to have been worth at least $250,000.00 "[b]ased on what [she] heard"; (c) plaintiff Daniel Kopp believed the house was worth more than $214,000.00, and "it wouldn't surprise [him] if the house was worth at least $250,000.00;" (d) defendant Richard Franks was of the opinion that the house was worth at least $270,000.00 at the time of trial. Plaintiffs produced evidence that the cost of restoring the home to the original specifications which plaintiffs had contracted for was $128,436.00. At trial, plaintiff Kopp testified:

Q. Okay. So you want that house out there. And you're asking equity today in what's fair?

A. Yes.

Q. And you're—tell the Judge that you think it's fair that you get that house for $52,000.00. Tell him that.

A. Yes, I do, considering what we've had to go through and put up with. Yes, I do.

In the proposed findings of fact and in the brief filed with this court (see Appendix attached), plaintiffs urged specific performance by the terms of which they receive the property for $41,992.92 ($13,00.00 down payment plus $28,992.92).

The trial court, in its conclusions of law, found that the plaintiffs failed to use good faith in performing their obligation under the contract in certain instances and that the defendants showed good faith in all their dealings with the plaintiffs. The trial court concluded that specific performance of the contract be denied for the following three reasons:

a. Plaintiffs' breach of the contract of May 7.

b. Specific performance as requested by Plaintiffs would work an unwarranted economic hardship on Defendants.

c. The lot and home are not sufficiently unique.

Plaintiffs assert six points on appeal: First, trial court error in finding that the plaintiffs breached the contract; second, trial court error in finding that neither the lot nor home were sufficiently unique to justify specific performance of the contract; third, trial court error in concluding that specific performance would work an unwarranted economic hardship on defendants; fourth, trial court error in not awarding plaintiffs' attorney's fees; fifth, trial court error in assessing costs against plaintiffs, and sixth, trial court error in approval of the appeal bond allowing the property, which was the subject of the lawsuit, to serve as the "appeal bond."

The trial court did not err in finding that an unwarranted economic hardship on defendants was grounds for denying specific performance as requested by plaintiffs. Accordingly, this court does not address the first point and second point of defendants' brief. "An appellate court opinion should be limited to those questions essential to a proper disposition of the appeal." *State ex rel. Ellsworth Freight Lines, Inc. v. State Tax Com'n of Missouri*, 651 S.W.2d 130, 133 (Mo. banc 1983), *cert. denied*, 465 U.S. 1001, 104 S.Ct. 1019, 79 L.Ed.2d 223 (1984); *Community Title Co. v. Roosevelt Fed. Sav.*, 670 S.W.2d 895, 899 (Mo.App.1984).

In reviewing a court-tried case, the primary concern of the appellate court is the correctness of the trial court's result, not the route taken to reach it. *Seabaugh v. Keele*, 775 S.W.2d 205, 207 (Mo.App. 1989); *Weber v. Knackstedt*, 707 S.W.2d 800, 804 (Mo.App.1986). Upon appellate review of a court-tried case, the overriding concern is whether the trial court reached the right result and not whether the reason assigned by the trial court for its judgment was correct or incorrect. *Delta Loan, Etc. v. Osage Outdoor Advertising*, 587 S.W.2d 653, 658 (Mo.App.1979). Appellate courts are obliged to affirm if it is determined that the trial court reached the correct result, regardless of the reasons given by the trial court, *Seabaugh v. Keele, supra,* and the trial court's decision will not be disturbed because the trial court gave a wrong or insufficient reason therefor. *Edgar v. Fitzpatrick*, 377 S.W.2d 314, 318 (Mo. banc 1964); *Payne v. Payne*, 728 S.W.2d 635, 638 (Mo.App.1987). Consideration of the third point that it was error to deny specific performance because to do so imposed unwarranted economic hardship on defendants, requires preliminary examination of certain principles of equity.

Specific performance, as sought by plaintiffs in this case, is purely an equitable remedy, *DeWitt v. Lutes*, 581 S.W.2d 941, 945 (Mo.App.1979), and must be governed by equitable principles. *Seabaugh v. Keele, supra; Green v. Woodard*, 588 S.W.2d 522, 524 (Mo.App.1979); *McDown v. Wilson*, 426 S.W.2d 112, 117–18 (Mo.App.1968). The equitable remedy of specific performance is invoked primarily that complete justice may be done between the parties, and courts of equity will not decree specific performance where it will result in injustice. *Hoover v. Wright*, 202 S.W.2d 83, 86 (Mo.1947). A greater strength of case is required for a decree of specific performance than to defeat a claim for specific performance. *Eisenbeis v. Shillington*, 349 Mo. 108, 114, 159 S.W.2d 641, 644 (1941). The equitable remedy of specific performance is not a matter of right but is a remedy applied by courts of equity, depending upon the facts in the particular case; and the trial court has judicial discretion within the established doctrines and principles of equity to award or withhold the remedy. *Cummins v. Dixon*, 265 S.W.2d 386, 397, 47 A.L.R.2d 441, 454 (Mo.1954).

Many established doctrines and principles of equity are available and give direction in determining if the trial court correctly exercised its discretion in denying plaintiffs a decree of specific performance. The common law of Missouri supports the "unclean hands" doctrine, *Best v. Culhane*, 677 S.W.2d 390, 395 (Mo.App.1984), and requires that a party coming into a court of

equity seeking specific performance must have acted in good faith. *Hackbarth v. Gibstine,* 182 S.W.2d 113, 118 (Mo.App. 1944). The trial court found in this case that:

> Plaintiffs failed to use good faith in the following instances:
>
> 1. Attempting to prevent contractor's fees in their dealings with Terry Addington.
>
> 2. Threatening to "nitpick" the contract.
>
> 3. Implying that they would not perform unless new non-contract conditions were met.
>
> 4. Accusing the Defendants of trying to cheat and "screw" them.

The trial court further found that "Defendants showed good faith in their dealings with Plaintiffs at all times." The trial court's findings are supported by the evidence found in the record, particularly, when due regard is given to the opportunity of the trial court to have judged the credibility of the witnesses. Rule 73.01(c).[1]

■ The law is clear that a decree for "specific performance is not a matter of right *even to enforce the terms of a legal and binding contract." Zoellner v. Carty,* 585 S.W.2d 289, 291 (Mo.App.1979) (emphasis added). Specific performance "is a matter of grace resting upon basic equities and residing within the sound discretion of the chancellor, depending in the last analysis, upon the facts of each particular case." *Zoellner, supra,* at 291. Discretionary denial of specific performance was approved in *Seabaugh v. Keele, supra,* at 207, as follows:

> The trial court included in its order a discretionary denial of specific performance because the "equitable considerations do not mitigate in favor of specific performance".... Viewing all the evi-

dence in the light most favorable to the judgment of the trial court we find no abuse of discretion.

The general rule set forth in 81 C.J.S. *Specific Performance* § 20a, pp. 737–39 (1977), was quoted with approval in *Zoellner,* 585 S.W.2d at 291, as follows:

> "Specific performance of a contract *is never decreed* when its enforcement would be inequitable or unconscionable, or produce injustice or *hardship* or where the specific performance of the contract would operate oppressively as to either party, even though there is no sufficient ground for rescission or cancellation." (Emphasis added.)

Finally, the above concepts find further support in Restatement (Second) of Contracts § 364(1) (1979), as follows:

> "(1) Specific performance ... will be refused if such relief would be unfair because
>
> .    .    .    .    .
>
> (b) the relief would cause unreasonable hardship or loss to the party in breach...."

The comment following § 364(1) of the Restatement (Second) of Contracts, notes that:

> [T]he discretionary nature of equitable relief permits its denial when a variety of factors combine to make enforcement of a promise unfair, even though no single legal doctrine alone would make the promise unenforceable. Such general equitable doctrines as those of laches and "unclean hands" supplement the rule stated in this Section.[2]

■ At trial, and again to this court, plaintiffs have urged that an order be issued directing that defendants transfer and convey to plaintiffs the subject real estate for $41,992.92. Plaintiffs urge such order be issued despite the following: (a) evi-

---

1. Rule references are to Missouri Rules of Civil Procedure (20th ed. 1989), except where otherwise indicated.

2. Restatement (Second) of Contracts §§ 356 and 357 comment c (1979), which reads as follows:
   "The granting of equitable relief has traditionally been regarded as within judicial discretion.... It is ... subject to general princi-

ples of equity that are not peculiar to contract disputes, such as those that bar relief to one who has been guilty of laches or who has come into court with unclean hands. Furthermore, it is subject to principles of common sense so that, for example, a court will not order a performance that is impossible...."

dence from plaintiffs' appraiser Janet Parsons that the property had a value of $235,000.00; (b) admission by plaintiff Shufeldt that the value of the property, as completed, was $250,000, maybe more; (c) admission by plaintiff Kopp that the house might be worth at least $250,000.00; (d) uncontroverted evidence that the defendants had $237,000.00 in the house when it was completed; (e) evidence both plaintiffs admitted that, for the most part, they were well pleased with the quality of the work completed (but insisted they were entitled to a $250,000.00 house for $41,992.92 because it was not finally completed in accord with their plan), and (f) uncontroverted evidence that defendants, in an effort to mitigate damages, spent an additional $48,000.00 after October 1987 to complete the house to make it more saleable (the $48,000.00 expenditure being after the events which the trial court found demonstrated "bad faith" on the part of plaintiffs).

Ordering defendants to specifically perform the contract upon the terms sought by plaintiffs would have resulted in an injustice, *Hoover, supra,* even though the contract was a legal binding contract. *Zoellner, supra.* Considering the bad faith of plaintiffs and the good faith of defendants in performing their respective obligations under the contract (as determined by the trial court and supported by the evidence), and considering the obvious inequity and unjustness of ordering defendants to turn over a $250,000.00 house to plaintiffs for $41,992.92, and considering the fact that the trial court ordered defendants to repay to plaintiffs all of the down payment, this court finds no abuse of discretion in the trial court's denial of specific performance as it was requested by plaintiffs. An order of specific performance under such circumstances would work an unwarranted economic hardship on defendants.

Plaintiffs claim the application of the principles enunciated in *Rust & Martin, Inc. v. Ashby,* 671 S.W.2d 4 (Mo.App.1984), demonstrates trial court error in its decision that unwarranted economic hardship on defendants precluded entry of a decree of specific performance. *Rust & Martin,*

*supra,* recognized "unreasonable economic waste" as a principle that may be used in determining the proper measure of damages in cases where there has been substantial, but defective, performance by a contractor. Simply stated, in determining the measure of damages to be used, the courts have held that the owner cannot recover for the cost of reconstruction and completion in accordance with the contract if to do so would involve an "unreasonable economic waste" (destruction of usable property). *Forsythe v. Starnes,* 554 S.W.2d 100, 109 (Mo.App.1977). If such "unreasonable economic waste" results, the owners' damage must be the difference between the value of the structure as completed and the value of the structure if it had been completed according to the contract. *Rust & Martin, supra,* at 6. Plaintiffs misinterpret *Rust & Martin;* that case is not authority for the proposition that "unreasonable economic waste" should never be considered in a residential construction contract in determining the appropriate measure of damages. Indeed, *Mathis v. Glover,* 714 S.W.2d 222, 228 (Mo. App.1986), involved damage issues arising out of a residential construction contract and recognized the possible applicability of economic waste to residential construction contracts, saying:

Nonetheless, the owners may not recover the cost of reconstruction and completion if this would involve unreasonable economic waste, i.e., destruction of usable property.

The court in *Rust & Martin, supra,* at 7, in deciding the proper measure of damages under the facts of that case, appropriately noted that what was reasonable to be used in a commercial building might not be reasonable for an owner to tolerate in a residence. That is not authority for the proposition that a court of equity was in error in refusing specific performance where, as here, plaintiffs were seeking a $250,000.00 house for $41,992.92.

Additional facts which distinguish *Rust & Martin* from this case are the following: *Rust & Martin* was a suit for damages for breach of contract, whereas plaintiffs here

sought specific performance. The trial court in this case did not specifically refer to "unreasonable economic waste," but rather, used the term "unwarranted economic hardship" in denying the equitable relief of specific performance. Finally, plaintiffs misinterpret the reason for the development of the "unreasonable economic waste" theory of determining damages. The economic waste analysis is a "judicial effort to find the just solution for the particular case by balancing the opposing policy objectives of giving the owner substantially what the contract requires, but doing so without exacting a forfeiture from the contractor." 41 A.L.R. 4th 131, 139 (1985). Plaintiffs do not here complain that the work or materials in the home were defective. Plaintiffs urge that the contractor should be required to spend (or be charged with) approximately $128,436.00 to rebuild and reconstruct a good quality home having a fair market value between $235,-000.00 to $290,000.00 so that the home would have the color woodwork, wall coverings and aesthetic features which had originally been the subject of the contract. This clearly is distinguishable from the facts in *Rust & Martin*. Requiring the defendants in this case to specifically perform the contract, as sought by plaintiffs, would exact a forfeiture from the defendants to the extent of being an unwarranted economic hardship.

■ Plaintiffs, in a further effort to demonstrate trial court error, urge that defendants are estopped to claim economic hardship as a reason for denying specific performance because it was defendants' conduct which rendered specific performance difficult for the trial court to award. Plaintiffs contend defendants should be estopped from claiming economic hardship when they finished the house to their own specifications and not to the specifications of the original contract. That argument ignores certain findings by the trial court which dispose of plaintiff's claim of estoppel. The trial court found that in a telephone conversation between plaintiff Lois Shufeldt and defendant Richard Franks on September 13, 1987, defendant was told to stop work on the house; that plaintiffs were going to "buy him out." The trial court also found specific instances of bad faith in the performance of the contract by plaintiffs which had happened before the September 13 telephone conversation. The trial court found that from September 9 to October 12, 1987, work on the house was at a standstill, and that each passing day was increasing the expense of the project to the defendants. The trial court found that the defendants' conduct in thereafter finishing the house to their specifications to make it more marketable was an effort on the part of the defendants to mitigate their damages. There was sufficient evidence in the record to support those findings, and, accordingly, the plaintiffs' urging that defendants should be estopped from claiming economic hardship was properly rejected by the trial court.

Denying specific performance, as requested by plaintiffs in this case, prevented them from receiving an uncontemplated opportunity to gather in a windfall after they had acted in bad faith with respect to their obligations under the contract. There was substantial evidence to support the denial of plaintiffs' request for specific performance. The trial court's judgment was not against the weight of the evidence and the decree did not erroneously declare or apply the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). The trial court's decree denying plaintiffs' requested specific performance was proper and is hereby affirmed.

■ The plaintiffs' fourth point is that the trial court erred in denying their request for attorney's fees. Plaintiffs rely on *Cimasi v. City of Fenton*, 659 S.W.2d 532, 537 (Mo.App.1983), to suggest that there were "very unusual circumstances" in this case which would justify equitable balancing of benefits by awarding attorney's fees to plaintiffs. Careful reading of the record and the briefs fails to demonstrate any of the unusual circumstances here which were found in *Johnson v. Mercantile Trust Company National Ass'n*, 510 S.W.2d 33, 40–41 (Mo.1974), or in *Dugger v. Welp*, 646 S.W.2d 907, 909 (Mo.App.

1983). The trial court did not err in failing to award attorney's fees to plaintiffs.

■ Plaintiffs next claim that the trial court was in error in assessing costs against them. Rule 77.01 provides:

In civil actions, the party prevailing shall recover his costs against the other party, unless otherwise provided in these rules or by law.

Other law which is applicable is § 514.090: [3]

"Where there are several counts in any petition, and any one of them be adjudged insufficient, or a verdict, or any issue joined thereon, shall be found for the defendant, costs shall be awarded at the discretion of the court."

In addition, given the equitable nature of the action, it was within the discretion of the trial court as to how the costs might be assessed; either party could have been ordered to pay the costs or they could have been apportioned among the parties. *Gieselmann v. Stegeman*, 470 S.W.2d 522, 525 (Mo.1971). Such discretion should not be disturbed unless an abuse of discretion is shown. *Gieselmann, supra; Davis v. American Nat. Bank*, 672 S.W.2d 182, 183 (Mo.App.1984). Apportionment of costs in equity, as well as in other cases where the trial court has discretion, must bear some relationship to the judgments upon all of the issues and the principle issue litigated. *Cox v. Crider*, 721 S.W.2d 220, 224 (Mo. App.1986). In this case, the principle issue litigated was whether or not defendants should be ordered to specifically perform a contract, and on that issue, defendants prevailed. This court does not find that the trial court abused its discretion in assessing costs to plaintiffs. That point is ruled against plaintiffs.

■ Finally, plaintiffs complain that the trial court erred in the "approval" of defendants' appeal bond. Rule 81.09 provides:

Appeals shall stay the execution ... (2) when the appellant, at or prior to the time of filing notice of appeal, presents to the court for its approval a supersedeas bond which shall have such surety or sureties as the court requires. The court

may also at or prior to the time of filing notice of appeal, by order of record, fix the amount of the supersedeas bond and allow appellant reasonable time, not exceeding twenty days, from the date of the order to file to file the same subject to the approval of the court or clerk, and such appeal bond, approved by the court or clerk and filed within the time specified in such order, shall have the effect of staying the execution thereafter....

In this case, defendants' cross-appeal notice was filed without presentation of a bond for approval of the trial court and without an order being filed fixing the bond. Rule 81.10 provides that after the notice of appeal is filed, the application for leave to file bond may be made only in the appellate court. Numerous motions were filed with this court seeking remand to the trial court for setting of the bond, and on July 12, 1989, this court entered the following order:

... [c]onsider[ing] the same as a motion pursuant to Rule 81.10 for leave to file a supersedeas bond as to that part of the judgement of the Circuit Court of Greene County ... which was a money judgment against said appellants, the Court sustains the motion....

It is ordered that any execution on the judgment referred to against these appellants is stayed until August 30, 1989, so that a supersedeas bond may be posted. The matter of the amount to be required, and approval of any tendered bond, is remanded to the trial court for determination.

The supplemental legal file presented to this court shows the only docket entry after remand to the trial court was as follows: "9/1/89 Appeal Bond filed." The supplemental legal file does contain an appeal bond in the amount of $20,000.00 which is signed by defendants as principal and sureties, and which recites that the security for the bond is defendants' pledge of the real estate which was the subject of the lawsuit. At the bottom of the bond form, the trial judge signed his name as approving the bond on August 29, 1989. It

---

**3.** References to statutes are to RSMo 1986, except where otherwise indicated.

is with this background that plaintiffs complain that the trial court erred in approving the bond.

Assuming that the bond approved by the trial court and filed is not the form of supersedeas bond contemplated by Rule 81.09 and does not afford the protection for plaintiffs which the rule intended (a finding which this court does not make), the question of the form and sufficiency of the bond is not before this court. Plaintiffs do not cite this court to any case, nor does this court find any case, where the mere endorsement by a court of its "approval" on a supersedeas bond has been held to be an appealable order. Rule 81.04 sets forth how and when appeals are taken:

> When an appeal is permitted by law from a trial court, a party ... may appeal from a judgment or order by filing with the clerk of the trial court a notice of appeal....

Section 512.020 makes the following provision:

> Any party to a suit aggrieved by any judgment of any trial court in any civil cause from which an appeal is not prohibited ... may take his appeal ... from any special order after final judgment in the cause....

In this case there was no order entered and no docket entry recorded which determined the amount of the bond. Given the particular facts of this case, this court finds that it has no jurisdiction to consider the sufficiency of the bond because mere endorsement by the trial court of its approval of the bond is not a "special order after final judgment" which would authorize appeal. Finality of judgment is a jurisdictional prerequisite to appellate jurisdiction. *Harris v. Union Elec. Co.*, 685 S.W.2d 607 (Mo.App.1985). This court has the duty to consider, sua sponte, whether it has jurisdiction and to determine if the purported order challenged is one from which an appeal can be taken. *Bragg v. Missouri Pacific R.R.*, 756 S.W.2d 666, 667 (Mo.App.1988). Because the endorsement on the bond by the trial court of its approval of the bond is not a "special order after final judgment in

the cause," the appeal of this issue is dismissed.

Defendants filed a cross-appeal. In their initial point, defendants claim that the trial court erred in denying their counterclaim for abuse of process. The abuse of process claimed by plaintiffs was the defendants' filing of a lawsuit and a lis pendens for the purpose of forcing defendants to settle on plaintiffs' terms and get a $250,000.00 house for $52,000.00. Apparently defendants are attacking the trial court's judgment denying their claim on the ground that there was no substantial evidence to support it.

The law of Missouri is well settled that to successfully assert a claim for abuse of process, the following facts must be pleaded and proven: (1) the party made an illegal, improper, perverted use of process, a use neither warranted nor authorized by the process; (2) the party had an improper purpose in exercising such alleged, perverted or improper use of process; and (3) damages resulted. *Dillard Dept. Stores, Inc. v. Muegler*, 775 S.W.2d 179, 183 (Mo.App.1989).

> "The essence of abuse of process is not the commencement of an action without justification, but it is the misuse of process for an end other than that which it was designed to accomplish."

*Guirl v. Guirl*, 708 S.W.2d 239, 245 (Mo. App.1986). There is no liability for alleged abuse of process where a party has done nothing more than pursue the lawsuit to its authorized conclusion, regardless of how evil a motive he possessed at the time. *Pipefitters H. & W. Tr. v. Waldo R., Inc.*, 760 S.W.2d 196, 198–99 (Mo.App.1988). The alleged abuse of process, claimed by defendants, arises out of the filing of a written notice of the pendency of this lawsuit with the recorder of deeds. Notice of lis pendens is authorized, and, in fact, mandated by § 527.260. The filing of lis pendens provides a record notice to potential purchasers of a pending suit which may affect title to property, and its purpose is to preserve rights pending the outcome of litigation. *Pipefitters H. & W. Tr., supra*, at 199. Clearly, the relief sought by plain-

tiffs was equitable in nature; it affected real estate, and in filing a lis pendens, they "were employing a legal procedure to effectuate the end contemplated by the process." *Pipefitters H. & W. Tr., supra,* at 199. The use of lis pendens in this case was legal and authorized by § 527.260. Absolute privilege attaches to filing of lis pendens as long as the notice has reasonable relation to the action filed. *Sharpton v. Lofton,* 721 S.W.2d 770, 777 (Mo.App. 1986). There was clearly a reasonable relationship between the suit for specific performance and the notice of lis pendens filed in this case, and no abuse of process occurred by reason of the filing of the same. The trial court's judgment denying defendants' claim for abuse of process is affirmed.

■ Defendants' second point on their cross-appeal claims error by the trial court in denying defendants' request for attorney's fees. This point is ruled against defendants. In the argument portion of their brief, defendants appear to rely upon Rule 55.03 for their claim that the trial court erred in failing to award attorney's fees. They claim that the pleadings filed by plaintiffs, together with the filing of the lis pendens, clearly constitute frivolous pleadings, and, hence, entitle them to attorney's fees. Rule 55.03 does not mandate an award of attorney's fees as a sanction even if the pleadings were frivolous. Rules 55.03 says:

> ... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, *which may include* an order to pay to the other party ... the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including *a reasonable attorney's fee.* (Emphasis added.)

The record does not show a repeated amendment of pleadings by plaintiffs in this case. They filed a four-count petition and went to trial on Count I of the petition as initially filed. Defendants cite us to no case where an award of attorney's fees has been made pursuant to Rule 55.03 under the facts as they exist in this case. Indeed, to interpret Rule 55.03 as authority for the award of attorney's fees under the facts of this case would interfere with assertion of legitimate debatable legal theories. The trial court's judgment denying defendants' request for attorney's fees is supported by substantial evidence and is affirmed.

■ Defendants' final point in their cross-appeal is that the trial court erred in awarding plaintiffs a judgment for $13,-176.68 because plaintiffs came into court with unclean hands, did not perform the contract in good faith, and anticipatorily repudiated the contract. This point is ruled against defendants.

Defendants' answer to plaintiffs' specific performance count contained the following language in the prayer for relief:

> WHEREFORE, Defendants pray this Court to enter a judgment in their favor ... and for such other and further relief as the Court deems just and proper in the premises.

Plaintiffs sought damages in conjunction with their claim for specific performance, but did not specifically request return of the down payment. However, the failure of plaintiffs to specifically request return of the down payment does not make the trial court's judgment erroneous. The law is well settled that even in those instances where a party does not seek particular relief, a court of equity can properly undertake to do full, adequate and complete justice between the parties when justified by the evidence. *Chapman v. Schearf,* 360 Mo. 551, 558, 229 S.W.2d 552, 555 (banc 1950); *Hoechst v. Bangert,* 440 S.W.2d 476, 480 (Mo.1969); *County of Bollinger v. Ladd,* 564 S.W.2d 267, 273 (Mo.App.1978). Although an award of damages is normally a legal remedy, a court of equity may award damages as a remedy, if necessary, in order to do equity. *State ex rel. Willman v. Sloan,* 574 S.W.2d 421, 422 (Mo. banc 1978).

It is a settled maxim that equity, once having acquired jurisdiction of a cause, will not relinquish it without doing full

and effective justice between the parties, even though, to right the wrong complained of, resort must be had to a remedy within the traditional province of law, as by a judgment for money by way of restitution.

*Perry v. Perry,* 484 S.W.2d 257, 259, 92 A.L.R.3d 1324, 1327 (Mo.1972). *See Craig v. Jo B. Gardner, Inc.,* 586 S.W.2d 316, 325 (Mo. banc 1979). The trial court in this case chose not to order specific performance because of the unwarranted economic hardship such order would work on defendants, but instead ordered defendants to return all monies plaintiffs had put into the house. The trial court's finding that the defendants had finished the house to their own specifications and occupied it as their own residence despite a written, legal and binding contract with plaintiffs was sufficient to attach equitable jurisdiction in the court and authorize legal relief in the form of damages or restitution. *Siesta Manor, Inc. v. Community Federal,* 716 S.W.2d 835, 839 (Mo.App.1986). The fact that the trial court found defendants had finished the house to their own specifications in order to mitigate damages did not deprive the court of its equitable jurisdiction. This entire matter was submitted in equity and the trial court was authorized to determine the whole controversy and render such judgments and orders as were consistent with the pleadings. *Hafford v. Smith,* 369 S.W.2d 290, 297 (Mo.App.1963). Bearing in mind the standard of review earlier mentioned, this court determines that the trial court did not commit error in entering judgment in favor of plaintiffs and against defendants for $13,176.68.

The trial court's judgment and order is affirmed in all respects.

FLANIGAN, P.J., and MAUS, J., concur.

## APPENDIX
(Taken from plaintiff's brief, pp. 59 and 60)

At the trial level, plaintiffs suggested to the court that relief be structured and damages be computed in the following fashion:

| | | | |
|---|---|---|---|
| 1. | Contract price | $210,000.00 | P.Ex. 10–A |
| 2. | + Accrued change orders | $ 5,183.75 | P.Ex. 16, 17 & 18 |
| 3. | Total Contract price | $215,183.75 | |
| 4. | − Downpayment | ($ 13,000.00) | P.Ex. 11 |
| 5. | Subtotal | $202,183.75 | |
| 6. | − 9% Int. on downpayment from 10–15–87 to 2–15–89 | ($ 1,560.00) | |
| 7. | − Cost of restoration | ($128,436.00) | P.Ex. 58 |
| 8. | − Moving expenses to Luster and to Cardinal | ($ 1,430.00) | T. 511–13 |
| 9. | − Furniture storage costs from 10–15–87 to trial date | ($ 458.00) | T. 513 |
| 10. | − Income tax impact of lost mortgage interest deductions for 1987 and for 1988 | ($ 9,955.00) | T. 510–11 |
| 11. | − Income tax payable on gain from sale of Stanford property under I.R.S. 2 year rule | ($ 1,360.00) | T. 507–09 |
| 12. | − Present value of increased mortgage interest rate | ($ 8,119.00) | T. 482–83 |
| 13. | − Additional one-quarter point to obtain financing | ($ 382.50) | T. 484 |
| 14. | − Copper chimney flashing, landscape timbers, and chimney cap | ($ 390.93) | T. 368; 165–66; 164–65 |
| 15. | − Loan processing fees | ($ 430.00) | P.Ex. 13 & 31 |
| 16. | − Attorney's fees and litigation expenses | ($ 20,669.40) | T. 514–15 |
| 17. | Balance due and owing to Defendants for purchase of 1489 Ginger Blue | $ 28,992.92 | |