**Robert C. CONLEY, Plaintiff/Appellant,**

v.

**Debra RAUSCHENBACH and Orvin A. Rauschenbach, Defendants/Respondents.**

No. 62813.

Missouri Court of Appeals, Eastern District, Division Four.

Sept. 21, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 4, 1993.

Gary L. Vincent, Clayton, for plaintiff/appellant.

Cyril J. Clancy, Kirkwood, for defendants/respondents.

GRIMM, Presiding Judge.

In this court-tried case, appellant broker sought specific performance of a real estate contract against respondents/sellers. The trial court denied broker's petition and awarded sellers $5,525 for their attorney fees. Broker appeals. We modify the judgment by deleting the attorney fees award and affirm.

Broker raises four points on appeal. The first two points relate to the trial court's findings that: (1) Orvin Rauschenbach (father/seller) never signed or accepted the real estate contract; and (2) offers were made to broker that were not conveyed to sellers. The third point alleges trial court error in failing to find that Debra Rauschenbach (daughter/seller) breached the contract and in failing to order specific performance. The fourth point alleges trial court error in awarding attorney fees to sellers.

## I. Background

The evidence viewed in a light most favorable to the judgment and consistent with the trial court's findings, discloses the following. Since at least 1983, father and daughter have owned a tract of land. In October, 1985, daughter signed a listing contract with broker on a portion of this property.

The following month, broker generated a contract for the sale of the property to a nursing home at $31,000 per acre. The contract, signed by daughter, was contingent upon successful rezoning. Broker told her he would take care of the rezoning. Later, broker told her the rezoning application had been turned down. About three years later, daughter determined that no application for rezoning had ever been made.

In June of 1988, daughter purchased an adjoining 1.84 acre tract of land. Father's name was placed on the deed as a joint tenant because it was the only way daughter could get a loan.

Broker told daughter "it was absolutely necessary" for her to purchase this property because "nobody [was] going to buy [her property] without it." Broker had a listing on this tract. He represented both the landowners and daughter in negotiating the sale. Also, he received a sales commission from landowners.

About each six months beginning October 1985, new listing agreements were signed by daughter and broker. Daughter signed the most recent listing agreement on July 11, 1988.

In August or September, 1988, broker called a builder and told him the listing contract was about to expire. Broker told builder he did not think the listing contract would be renewed, and wanted to know if builder was still interested in the property. Builder was interested and told broker he would "probably be willing to pay" $30,000 an acre. Broker told him that daughter did not want that much and suggested he offer $22,500 * per acre, which he did.

Broker took builder's offer to daughter. He told her to reject the offer because she could get more. Daughter asked if she could make a counteroffer for $29,000. Broker told her "definitely not to counter it like that, that he would go back and try to get" a higher offer.

Daughter rejected that offer. Broker told builder the reasons were (1) too low of a price, and (2) too long until closing. Builder asked broker what price she was looking for, and broker suggested $24,000. Builder signed a new offer for that amount and suggested that he meet with daughter. Broker rejected this suggestion.

Broker then prepared a contract of his own offering $24,000 an acre. Broker submitted the two contracts to daughter at the same time. Broker told daughter that $24,000 was the most builder was willing to pay. Broker said broker's offer was better because daughter was to retain her house and would receive four lots, all of which would be rezoned. Daughter signed broker's contract

---

* In addition to the price per acre, each contract mentioned contained other terms that affected the total consideration.

on October 20, 1988; father signed November 7, 1988.

Builder's offer was rejected. Builder asked why daughter did not make a counteroffer. Broker responded, "Well, she took another offer. And I'm going to be handling the zoning process for the people." He did not tell builder that it was his offer that was accepted.

We emphasize three terms of broker's purchase contract with sellers. First, the contract contained a contingency for rezoning. Second, it provided that closing would occur on June 22, 1989. Third, the contract could be modified or amended only by a written instrument signed by sellers and broker.

Broker attempted to rezone the property, but was unsuccessful in his efforts. During his attempts at rezoning, broker prepared an amendment to the October 20, 1988 contract. This amendment changed the closing date from June 22 to September 22, 1989. It also reduced the number of lots retained by sellers from four to two. Daughter signed this amendment on February 12, 1989, but father never signed it.

During the years the property was listed, daughter would periodically ask broker about the status of the property. Broker would tell daughter "there wasn't anyone interested," the price was "too high," the property was "very poor[ly] laid-out," it was "undesirable," and it "needed maximum grading." However, during this time, many builders had expressed an interest in purchasing the property. These builders were always told by broker that the property was sold or under contract.

## II. The Contract

In his first point, broker claims the "trial court erred in finding that [father] never signed or accepted the real estate contract because [father] signed a real estate contract for the sale of the subject real estate ... on November 7, 1988."

The trial court in its findings of fact and conclusions of law stated:

The Court finds as a fact that the contract [in] dispute was accepted and signed by [daughter] but that the contract was never accepted or signed by [father].

Broker argues that although father did not sign the amendment, the original contract was still in force. He contends that this case should be remanded to determine whether broker is "entitled to specific performance of the contract that was signed" by daughter and father.

Broker's contention overlooks his pleadings and testimony. These fully support the trial court's finding that "the *contract [in] dispute* ... was never accepted or signed by" father. (emphasis added). In his petition, broker pled

4. On or about the 22nd day of October 1988, [broker] and [sellers] entered into a written agreement for the purchase/sale of said land; . . . .

\*      \*      \*      \*      \*      \*

7. The contract was amended on or about February 12, 1989, . . . .

8. Plaintiff has been and now is ready, willing and able to perform said contract. . . .

\*      \*      \*      \*      \*      \*

12. Closing on *this contract* was set for September 22, 1989, ... and [sellers] were notified of same; whereat [broker] appeared ready to perform, however [sellers] failed to appear and close the contract. (emphasis added).

WHEREFORE, [broker] prays for a decree ordering that [sellers] 1) perform the contract according to its terms. . . .

It is clear that the contract sued on is the "amended" contract, not the original contract. Paragraph 12 alleges that the contract was to be closed on September 22. This clearly refers to the "amended" closing date, not the closing date in the original contract.

Broker was his sole witness. He was asked if he was "ready, willing, and able to perform the contract on the closing date as extended?" He replied, "Yes." Obviously, when referring to the "closing date as extended," broker's attorney meant September 22, not the original June 22 closing.

The original contract is the only one that father and daughter signed. Nothing in the record even so much as hints that broker ever indicated he was ready, willing, or able

to close the original contract on June 22. Point denied.

## III. Conveyance of Offers

In his second point, broker claims the "trial court erred in finding that offers were made to [broker] and that these offers were never conveyed to [sellers] because ... the evidence showed that Brookview Nursing Home, Inc. and [builder] made the only offers to purchase the real estate and [broker] conveyed these offers to [daughter]."

The trial court found that "during the period of time that the property was listed with [broker] there were offers made to [broker] and that these offers were never conveyed to [daughter] or [father]." Broker asserts this finding is inaccurate because "an offer must contain all of the essential terms of the agreement" and broker conveyed the two offers which meet those requirements.

The trial court did not use "offer" in the sense broker suggests. Rather, it appears the trial court referred to the many, substantial inquiries which developers made of broker and broker's inaccurate replies. Two examples suffice.

First, Robert Gates, a builder-developer, called broker in November, 1987, to inquire about the property. Broker told him "there was a contract on the property." Gates asked if he could write a backup contract. Broker told him "there already was a backup contract on it." In November, 1987, neither a contract nor a backup contract existed on the property.

Second, Doug Hufton, another builder-developer, called broker about the property. Broker told him "there were already two contracts on it." Two contracts never existed on the property at the same time during the entire period the property was listed with broker. Point denied.

## IV. Obligation to Perform

For his third point, broker alleges the "trial court erred in not finding that [daughter] breached the contract ... and in failing to order specific performance ... because

[daughter] was obligated under the real estate contract to act in good faith to support [broker's] attempt to rezone the property and her failure to do so constituted a repudiation of the contract...."

We need not determine whether daughter breached the contract. Instead, we look at the equitable remedy broker sought, specific performance. Trial courts have discretion within the established equitable doctrines and principles to award or withhold that remedy.

An established equitable doctrine is the doctrine of "unclean hands." *Kopp v. Franks*, 792 S.W.2d 413, 419 (Mo.App.S.D. 1990). That doctrine "requires that a party coming into a court of equity seeking specific performance must have acted in good faith." *Id.* at 419–20.

Here, the trial court found: (1) broker had purchased property adjoining sellers' property and broker had an interest in the potential development of sellers' property, (2) broker was evasive and misleading in his response to inquiries about the property, and (3) this suit was broker's attempt to compel the sale of the real estate to him because of his interest in development of the entire tract. These findings are supported by the evidence and support the trial court's denial of broker's request. Point denied.

## V. Attorney Fees

For his fourth point, broker alleges the "trial court erred in awarding [sellers] attorneys' fees because attorneys' fees are not recoverable as damages in this proceeding...." The trial court awarded $5,525 "as and for [sellers'] attorneys fees."

"Attorney's fees are special damages ... which must be specifically pleaded in order to be recovered." *Washington Univ. v. Royal Crown Bottling Co.*, 801 S.W.2d 458, 470 (Mo.App.E.D.1990) (citations omitted). Here, sellers failed to specifically seek attorney fees in either their answer or counterclaim. Nor did their prayers seek attorney fees.

In their counterclaim, they merely pled that they had "suffered damage ... and will continue to suffer damage," seeking an award for such damages. The prayer in their counterclaim sought (1) general damages, (2) punitive damages, (3) costs, and (4)

"such other and further relief as to the Court may seem just and proper."

 Moreover, the general rule permitting the award of attorney fees permits those fees only (1) when called for by contract, (2) when provided by statute, (3) when, as an item of damage, their incurrence involves the wronged party in collateral litigation, and (4) occasionally, when a court of equity finds it necessary to adjudge them in order to balance benefits. *Arnold v. Edelman*, 392 S.W.2d 231, 239 (Mo.Div. 1 1965). The equitable balancing of benefits occurs only in very unusual circumstances. *Osterberger v. Hites Constr. Co.*, 599 S.W.2d 221, 230 (Mo. App.E.D.1980).

In *Dugger v. Welp*, 646 S.W.2d 907, 909 (Mo.App.E.D.1983), we construed "unusual circumstances" to mean "an unusual type of case or unusually complicated litigation." This case does not meet the "unusual circumstances" test. The award of attorney fees was not authorized.

Pursuant to Rule 84.14, which directs us to "dispose finally of the case," the trial court's judgment is modified to delete the award of attorney fees. As modified, the judgment is affirmed.

CARL R. GAERTNER and AHRENS, JJ., concur.