Patricia A. HOLTMEIER,
Respondent/Cross–
Appellant,

v.

John DAYANI, Elizabeth Dayani, American Nursing Resources, Inc., American Nursing Resources Home Health, Inc., and Medifax, Inc., Appellants/Cross–Respondents.

Nos. 62467, 62468 and 62637.

Missouri Court of Appeals,
Eastern District,
Division Three.

Sept. 14, 1993.

civil action for two counts of breach of contract against defendants John Dayani, Elizabeth Dayani, American Nursing Resources, Inc., American Nursing Resources Home Health Care, Inc. and Medifax, Inc. All defendants appeal. Additionally, Holtmeier cross-appeals the trial court's denial of her motion for additur.

On appeal defendants' allege the trial court erred in the following manner: (1) in failing to direct a verdict for defendants at the close of all the evidence in that Holtmeier failed to prove the existence of a contract for the purchase of her stock; (2) in admitting certain evidence in violation of the parole evidence rule; (3) in failing to direct a verdict for defendants on their defense of the statute of frauds; (4) in failing to direct a verdict for Elizabeth Dayani and the corporate defendants in that Holtmeier failed to prove that John Dayani was acting as the agent for Elizabeth Dayani and the corporate defendants; (5) in admitting certain evidence relating to payments made by Dayani on an installment note; (6) in admitting evidence relating to the asset sale of the corporate defendants; (7) in failing to enter judgment in favor of the Dayanis' on their counterclaim for specific performance of the Stock Transfer and Shareholder Agreement. Holtmeier alleges the trial court erred in failing to grant her request for additur. We affirm in part, reverse in part and remand with instructions and modify in part.

The record reveals the following facts which we view in a light most favorable to the verdict, considering only that which supports it, and disregarding contrary evidence and inferences. *Lane v. Cape Mutual Insurance Company*, 674 S.W.2d 644, 645 (Mo. App.1984). Holtmeier is a registered nurse. In 1979, while residing in San Antonio, Texas, Holtmeier began working for Kimberly Nurses, Inc., as a nurse and later as the Director of Kimberly Nurses' San Antonio office. John Dayani was a vice president of Kimberly Nurses in charge of the region that included Holtmeier's San Antonio office. Holtmeier and John Dayani became friends in addition to working together at Kimberly Nurses. In April, 1981, Kimberly Dayani, the brother of John Dayani and president

Dennis L. Davis, Kansas City, for appellants.

Thomas Cicardi Devoto, St. Louis, for respondent.

STEPHAN, Judge.

This is an appeal from a jury award in favor of plaintiff, Patricia A. Holtmeier, (Holtmeier) in the amount of $950,000.00 in a

and founder of Kimberly Nurses, died unexpectedly of a massive heart attack. Sometime thereafter, John Dayani told Holtmeier that he was resigning from Kimberly Nurses. He resigned in the fall of 1981. Holtmeier testified that John Dayani began to talk with her about starting a national company similar to Kimberly Nurses that would be nurse owned and operated. Holtmeier resigned from Kimberly Nurses in December, 1981. In 1982, Holtmeier and John Dayani started a secretarial service in San Antonio, Texas, called American Temporary Resources. John Dayani was also president and chief executive officer of three other companies called Medifax, Inc. (Medifax), American Nursing Resources, Inc. (ANR) and American Nursing Resources Home Health Agency, Inc. (ANRHHA). (At times hereinafter ANR, ANRHHA and Medifax are collectively referred to as "the companies" or as "the corporate defendants.") Holtmeier was paid by Medifax for her employment at American Temporary Resources. At this time, John Dayani began talking to Holtmeier about moving to St. Louis, Missouri, to open an ANR office there.

In September, 1982, Holtmeier moved from San Antonio to St. Louis, Missouri, to open an ANR office. Holtmeier testified that John Dayani promised her in return for her move to St. Louis and her efforts to open and work at an ANR office in St. Louis, she would own twenty percent of ANR. Holtmeier also testified that John Dayani promised her twenty percent of two other companies, Medifax and ANRHHA. He promised her that her total interest in the companies would at least be one million dollars.

In 1983, Holtmeier asked John Dayani for written documentation of her twenty percent ownership in ANR, ANRHHA and Medifax. Thereafter, a dispute arose as to the percentage of stock John Dayani promised to Holtmeier and the total value of the stock. On January 1, 1984, Holtmeier received a document entitled "Stock Transfer and Shareholder Agreement." The document transfers stock shares in ANR, ANRHHA and Medifax from John and Elizabeth Dayani to Holtmeier. However, after receiving the stock shares, Holtmeier worried that the shares

she received from them did not reflect the interest John Dayani had promised her. After unsuccessfully attempting to resolve the dispute, Holtmeier resigned from ANR and ANRHHA in November, 1989. In December, 1989, Holtmeier demanded payment, in the amount of one million dollars, for her interest in the stock. Defendants refused and, upon learning of Holtmeier's resignation, John Dayani and his wife, Elizabeth, informed Holtmeier of their option to purchase Holtmeier's stock. Holtmeier testified she was not willing to tender her stock certificates to defendants unless they were willing to pay her one million dollars for her interest.

Holtmeier filed a four count petition against all defendants. The case went to trial on two counts of breach of contract. A jury returned a verdict in favor of Holtmeier in the amount of $950,000.00.

## DEFENDANTS' APPEAL

Defendants' allege the trial court erred in failing to direct a verdict for defendants because Holtmeier's petition set forth a different version of the agreement between defendants and Holtmeier than that which was submitted in Instructions 4, 5, 6, 7 and 8, and, in any event, defendants contend the record contains no evidence from which a jury could find an agreement as hypothesized in Instructions 4, 5, 6, 7 and 8.

■ The standard of review for the direction of a verdict is that it is inappropriate unless, viewing the evidence in a light most favorable to the plaintiff, reasonable minds could only find in favor of defendants. *SAB Harmon Ind. v. All State Bldg. Syst.*, 733 S.W.2d 476, 485 (Mo.App.1987).

In Count I, paragraphs 4, 5 and 6, of Holtmeier's amended petition she alleges that in September, 1982, John Dayani on behalf of himself and acting as an officer for ANR, ANRHHA and Medifax, asked Holtmeier to come to St. Louis to open ANR, ANRHHA and Medifax offices in St. Louis. In return for Holtmeier terminating her employment and relocating to St. Louis, John Dayani promised her, on behalf of himself and all other defendants, a twenty percent

**396**

ownership in each of the three companies—ANR, ANRHHA and Medifax. John Dayani further promised to Holtmeier that her interest would always be worth at least one million dollars. Holtmeier thereafter terminated her employment in Texas and moved to St. Louis where she opened an ANR office in Clayton, Missouri and an ANRHHA office in Washington, Missouri.

Holtmeier further alleges in Count I, paragraphs 8, 9 and 10 that John Dayani continued to represent to Holtmeier that her interest in the companies would be minimally one million dollars but then began discussing with her different percentages her stock represented, changing the interest figure from twenty percent to three percent. In March, 1985, John Dayani gave stock certificates to Holtmeier which represented the following shares: 12 shares of ANR, 12 shares of ANRHHA and 300 shares of Medifax.

In Count I, paragraph 11, Holtmeier alleges she was concerned that she had not received the compensation she and John Dayani had agreed upon, a minimum of a one million dollar interest in the corporations. In a letter dated December 11, 1986, John Dayani wrote to Holtmeier guaranteeing her that her shares of stock would be worth one million dollars minimally. Thereafter, John Dayani agreed to execute a note guaranteeing her payment of $500,000.00 together with a further promise of another $500,000.00 at a later date. One note was executed with first payment due on January 1, 1989, and last payment due on January 1, 1994.

Holtmeier further alleges in Count I, paragraph 12 and 13, that in early 1988 she learned that her shares of the companies represented less than one percent of the issued and outstanding stock. She made demand upon all defendants to purchase her stock for one million dollars.

In Count IV, paragraph 4 and 5, Holtmeier alleges that on or about March 1, 1987, all defendants executed a note payable to Holtmeier in the amount of $500,000.00. This note provided that defendants were to pay Holtmeier $5,000.00 on or before the first of each month beginning January 1, 1989, and continuing until January 1, 1994, when the entire amount would be due. Holtmeier fur-

ther alleges in Count IV, paragraphs 6, 7, 8, 9 and 10, that she performed all of her obligations under the note. She received ten payments on the note. However, she received no payments after October, 1989. By letter dated November 22, 1989, she advised defendants of their default and exercised her option to accelerate the payments due, declaring the entire amount due and payable no later than December 8, 1989. She alleges in her amended petition defendants have failed to make payment on such note.

The question defendants' issue presents is whether Holtmeier's amended petition, Counts I and IV, and the evidence presented at trial is reflected in Instructions 4, 5, 6, 7 and 8 as submitted. Initially, we note that defendants failed to object to any instructional error at trial. Missouri Supreme Court Rule 70.03 gives counsel the right not to object at trial to an instructional error as long as the specific objection is raised in the motion for new trial. This preserves the matter for appellate review. *Nakata v. Platte County R–3 School District,* 750 S.W.2d 669, 674 (Mo.App.1988). Because, defendants did raise the point in their motion for new trial, we will review.

The evidence revealed that from some time in 1981 through June, 1984, John Dayani represented to Holtmeier that she would have an ownership interest in ANR, ANRHHA and Medifax. The evidence also revealed that John Dayani represented to Holtmeier that her interest would be worth at least one million dollars.

Holtmeier testified that John Dayani had promised her she would have one million dollars or more before she was 40 years old. Holtmeier testified that she met with John Dayani in St. Louis, at Barnes Hospital, to discuss the letter she had received. At that meeting, Holtmeier testified that John Dayani assured her that her interest would be worth a minimum of one million dollars. He further told her that she was like a sister to him and that he would do for her what his brother had done for him. John Dayani testified that he told Holtmeier at that meeting "if we do our job right as I did with my brother I would not be surprised that the

share in the stocks could be worth [a million dollars], because that's what happened to me."

Holtmeier produced a letter from John Dayani to her, dated October 10, 1983, stating "This is to reaffirm to you [Holtmeier] what I [John Dayani] previous [sic] told you back in June of 1982. It is still my intention ... to transfer to you a total of 3% of some form of stock ownership of Medifax, American Nursing Resources and Home Health Agency. This of course assumes that ... you will continue your loyal employment with the Company, not competing with it and maintaining confidential all of its confidential and propietary information." This letter is signed by John Dayani as president of Medifax.

Holtmeier testified she was very upset by this letter because John Dayani had changed the represented stock interest he had promised her from twenty percent to three percent. She testified that, in her previous discussions with John Dayani, he had promised her that her interest in the companies would be worth a minimum of one million dollars. Holtmeier testified she was particularly concerned about the amount the stock represented because she had considered starting her own company. She testified she felt she would have made a profit for herself of at least one million dollars if she started her own company, but instead agreed to help John Dayani in his endeavors based on his promise.

On January 1, 1984, Holtmeier received a letter from John Dayani signed as President of Medifax on Medifax letterhead, advising her that he had arranged "to transfer ... an ownership interest in [Medifax, ANR and ANRHHA] ..." to Holtmeier. Attached to the cover letter was a document titled "Stock Transfer and Shareholder Agreement." The document is between Holtmeier and John and Elizabeth Dayani. The document states in part, "in September of 1981, [John Dayani], grateful of the loyalty, friendship, love and devotion that his close friend and acquaintance, Holtmeier, had always given to him and that Holtmeier had agreed to work with him in his medical transcription and nursing endeavors, promised and became le-

gally bound to transfer to Holtmeier an ownership interest in such business endeavors of [John Dayani]". The document, effective January 1, 1984, transfers from John and Elizabeth Dayani to Holtmeier 300 shares of stock in Medifax, 12 shares of stock in ANR and 12 shares of stock in ANRHHA. It also provides for the companies to exercise a first option to purchase the stock from Holtmeier if Holtmeier would die, become disabled, retire from employment or participate in activities that are in competition with Medifax, ANR, or ANRHHA. John and Elizabeth Dayani had the second option to purchase the stock once the companies' option had expired. The document is signed by John Dayani, as president of the three defendant companies. Holtmeier also signed and returned the agreement to John Dayani. Elizabeth Dayani did not sign the document.

Holtmeier did not receive the actual stock certificates until March, 1985. After receiving the stock certificates, Holtmeier complained to John Dayani that the stock certificates did not set forth the dollar amount of her interest and requested that John Dayani state in a letter that Holtmeier's interest would be guaranteed at one million dollars. Holtmeier testified that John Dayani told her in March, 1986, that he would purchase her stock for a million dollars in two years. Holtmeier received a handwritten letter not on company letterhead dated May 25, 1986, from John Dayani stating, in part, "You [Holtmeier] as an owner have the opportunity to be able to withdraw money from the company against your ownership of up to one million dollars, which would be due as the company is mergered [sic] or sold upon receipt of your ownership value. [Holtmeier] I will make certain that the value of your ownership is at minimum worth one million and more, if less I will personally purchase your shares at a million dollar value."

Shortly after the receipt of the letter dated May 25, 1986, Holtmeier told John Dayani that she was beginning to think about resigning from the company for personal reasons. However, at this point, John Dayani began to dispute that he had told Holtmeier that she had a twenty percent interest in each of the three companies. John Dayani suggested

that he and Holtmeier meet with Dr. Francis Winter to mediate their differences. Elizabeth Dayani also attended this meeting. After the meeting, John Dayani stated he would draft a letter outlining what they had discussed in the meeting. In a letter dated December 11, 1986, from John Dayani to Holtmeier, John Dayani stated, in part:

I will start to put together a promissory note for you with the specific implementation date of no later than December 31, 1988. This promissory note will have three phases.

Phase 1 Sell [sic] of your stock independently at a reasonable value with remainder of the one million due you at the sell [sic] or merger of the company no later than December 31, 1988.

Phase 2 If your stock or the company are not sold before December, 1988, I or the company will purchase your stock at that time at a responsible multiple of the asset [sic] of the company, up to one million dollars.

Phase 3 If phase 1 or 2 did not materialize, I will personally liquidate assets where possible to put together a sum of $500,000 cash and 5% interest on the remaining $500,000 after the first twelve months until such time the company has been mergered [sic], sold or gone public.

This letter also made reference to a life insurance policy that John Dayani intended to purchase naming Holtmeier as beneficiary. He stated in the letter, "If I die before all these goals are met, I will have a million dollar insurance policy purchased by me with you as beneficiary so that your needs will be met." At trial, Holtmeier produced a Jackson National Life Insurance policy purchased by John Dayani with a face amount of $1,100,000.00 naming Holtmeier as the beneficiary. The policy issue date is February 2, 1987. The premiums were paid by the accounting manager of Dayani's companies.

Testimony revealed that after Holtmeier received the letter from John Dayani outlining his plan, she contacted him to tell him that in the meeting they had agreed to a different interest rate on the installment note. She told him she agreed with his acknowledgement that there would be two notes to be signed by John Dayani, one note to be paid in a lump sum of $500,000.00 but it was her understanding that the second note, an installment note, would be for $500,000.00, payable over five years at a ten percent interest rate not a five percent interest rate as he had indicated in his letter. John Dayani admitted at trial that although his letter of December 11, 1986, mentioned a five percent interest rate on the installment note the parties later agreed to a ten percent interest rate.

Thereafter, two notes, each dated March 1, 1987, were prepared for John Dayani's signature. Only one note, the installment note, is signed by John Dayani. It is signed both individually and in his capacity as president of Medifax, ANR and ANRHHA, and provides for John Dayani and ANR, ANRHHA and Medifax to pay Holtmeier the sum of $500,000.00 over five years at a ten percent interest rate due and payable January 1, 1994. It also provides for monthly installments of $5,000.00 payable on the first day of each month beginning January 1, 1989, and continuing until January 1, 1994, and any remaining unpaid balance due at that time. The note provided that upon default in the payment of the note, the entire indebtedness is matured at the option of Holtmeier. The other note, the lump sum note, was not signed by John Dayani. Kathy McNamara, financial officer of ANR, testified that she told John Dayani not to sign the lump sum note because she was trying to protect the best interests of the company and wanted to attempt to transfer liability from the company to John Dayani. In a letter dated March 23, 1987, to Holtmeier, Kathy McNamara stated she wanted to "avoid recording the $1,000,000.00 promise to [Holtmeier] on the books of the Company." Holtmeier testified that John Dayani stated to her that he could not sign the lump sum note "because it would look bad on the books."

John Dayani's and Holtmeier's testimony conflicted as to whether there were conditions upon the delivery to Holtmeier of the installment note. Holtmeier testified that she received the note in March, 1987, without any objections or conditions of any kind. However, John Dayani testified that his

agreement was conditioned upon Holtmeier's signature on an addendum. Holtmeier received a letter from Kathy McNamara dated March 10, 1987. Enclosed with the letter was an addendum to the installment note. The letter requested Holtmeier's signature on the addendum. The addendum, signed only by John Dayani, makes reference only to one note, the installment note, held by Holtmeier for the amount of $500,000.00. The addendum states, in part, that during the period of employment and for a period of two years following the date January 1, 1989, or until such time the company is sold or liquidated, Holtmeier will not directly or indirectly compete with ANR, ANRHHA or Medifax in the business in which these companies are involved. Kathy McNamara testified that she did not speak with John Dayani about the covenant not to compete until about March 10, 1987, after the installment note had been sent back to Holtmeier. Holtmeier did not sign the addendum.

Holtmeier received ten payments on the installment note. The payments were made with company checks. The payments were each in the amount of $5,000.00 and began in January, 1989, and ended October, 1989. In December, 1989, Holtmeier demanded payment, in the amount of one million dollars, for her interest in the stock. Defendants refused and, upon learning of Holtmeier's resignation, John Dayani and his wife, Elizabeth, informed Holtmeier of their option to purchase Holtmeier's stock. Holtmeier testified she was not willing to tender her stock certificates to defendants unless they were willing to pay her one million dollars for her interest.

Instruction 4 was submitted as follows:

Your verdict must be for plaintiff Patricia Holtmeier and against defendant American Nursing Resources, Inc., if you believe:

First, John Dayani was acting within the scope and course of his agency for defendant American Nursing Resources Inc., at the time of the agreement, and

Second, plaintiff and John Dayani entered into an agreement whereby plaintiff agreed she would continue her employment with American Nursing Resources,

Inc., and with American Nursing Resources Home Health Agency, Inc., and John Dayani agreed that on January 1, 1989, defendant American Nursing Resources, Inc., would pay plaintiff $1,000,-000.00 for her interest in American Nursing Resources, Inc., American Nursing Resources Home Health Agency, Inc., and Medifax, Inc., and

Third, plaintiff performed her agreement, and

Fourth, defendant American Nursing Resources, Inc., failed to perform its agreement, and

Fifth, plaintiff was thereby damaged.

Instructions 4, 5, 6, 7 and 8 are identical except that each instruction is specific to each of the individual defendants: ANR, ANRHHA, Medifax, John Dayani and Elizabeth Dayani.

■■■■ Instructions to a jury must be supported by the evidence from which the jury could reasonably determine the issues submitted in the instructions. *Hopkins v. Goose Creek Land Co., Inc.,* 673 S.W.2d 465, 467 (Mo.App.1984). In determining the propriety of an instruction, evidence must be viewed in the light most favorable to the submission of the instruction, and a party is entitled to an instruction upon any theory supported by the evidence. *Id.*

■■■■ Our review of Holtmeier's contentions as she pleaded in Count I and Count IV of her amended petition and the evidence presented at trial, clearly establishes there was enough evidence to support the submission of Instructions 4, 5, 6, 7 and 8 and that the instructions properly reflected the evidence. We further note that these instructions were free from over burdening the jury with too much evidentiary detail. *See* Rule 70.02(b) and *Graham v. Goodman,* 850 S.W.2d 351, 354 (Mo. banc 1993).

■■■■ As we noted above, defendants failed at trial to object to these instructions as improperly reflecting the pleadings. Even if her theory was not properly pleaded, failure to timely and specifically object to evidence beyond the scope of the pleadings constitutes consent for determination of is-

sues thereby raised, and issues raised by implied consent are treated as if raised by the pleadings even though the pleadings are not formally amended to conform to the evidence. Rule 55.33(b); *Midwest Materials Co. v. Village Development Co.*, 806 S.W.2d 477, 488 (Mo.App.1991). A party is entitled to have an instruction on an issue which has been tried voluntarily as by implied consent of the parties. *Smith Moore v. J.L. Mason Realty Inv.*, 817 S.W.2d 530, 535 (Mo.App. 1991); *S.P. Personnel Assoc., Etc. v. Hospital B. & E. Co.*, 525 S.W.2d 345, 350 (Mo.App. 1975).

Instructions 4, 5, 6, 7 and 8 reflected the pleadings and the evidence and were properly submitted to the jury. The trial court did not err in denying a directed verdict in favor of defendants on this point. This point is denied.

■ Defendants also contend the trial court erred in failing to direct a verdict for them on their defense of the statute of frauds. They allege that the evidence showed that the contract to purchase Holtmeier's stock was not evidenced by a writing signed by defendants sufficient to satisfy the requirements of Section 400.8–319 RSMo Supp.1992.

Section 400.8–319 RSMo Supp.1992 states, in part,

> A contract for the sale of securities is not enforceable by way of action or defense unless: (a) there is some writing signed by the party against whom enforcement is sought ... sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price....

Here, evidence showed that an agreement between the parties was based on both oral statements and writings none of which evidenced the entire contract. Those writings included: the October, 1983, letter, in which John Dayani affirmed his committment to transfer three percent stock ownership in each of the companies to Holtmeier; the Stock Transfer and Shareholder Agreement dated January, 1984; the May 25, 1986, letter from John Dayani to Holtmeier guaranteeing the million dollar value of the stock;

the December 11, 1986, letter from John Dayani to Holtmeier outlining John Dayani's plan to implement the sale of Holtmeier's stock interest for one million dollars; and the $500,000.00 installment note. Additional statements made by John Dayani between 1981 and 1987 support the finding of an oral contract—a one million dollar promise by defendants for Holtmeier's stock interest in the companies which she received for her relocation to St. Louis and work in opening an ANR office in St. Louis and an ANRHHA office in Washington, Missouri. An oral contract may be established by a combination of oral testimony and documents not themselves meeting the statute of frauds. *Burgess v. Wright*, 565 S.W.2d 854, 856 (Mo.App.1978); *Alonzo v. Laubert*, 418 S.W.2d 94, 98 (Mo. 1967).

■ An exception to the statute of frauds is invoked where to apply the bar is to work a fraud. *Burgess v. Wright, supra.* In the case at hand, there was full performance on the part of Holtmeier, taking the contract out of the statute of frauds. In *Koman v. Morrissey*, 517 S.W.2d 929 (Mo.1974), an employee brought an action against an employer for specific performance of an oral employment contract under which the employer agreed to transfer ten percent of the stock of the corporation he formed to employee in exchange for employee's services in developing apartment buildings. The employer argued that the agreement was for the transfer of stock and therefore employee's right to the stock was barred by Section 400.8–319. However, the evidence showed that the employee had fully performed his portion of the contract. The court stated "the great weight of authority supports the rule that the statute of frauds has no application where there has been full and complete performance of the contract by one of the contracting parties.... It must be concluded that since the decision in *Joseph Schlitz Brewing Co. v. Missouri Poultry & Game Co.*, 287 Mo. 400, 229 S.W. 813 (1921), Missouri has joined the great weight of authority noted above...." *Koman, supra*, at 935–936 (citations omitted).

Here, Holtmeier fully performed and thus, the statute of frauds is no defense. To apply

the defense of the statute of frauds here would work to invoke a fraud. *Burgess, supra,* at 856. The trial court correctly held that defendants were not entitled to a directed verdict on their defense of the statute of frauds. This point is denied.

■ Defendants also contend that the trial court erred in admitting certain evidence relating to statements made by the defendants prior to the Stock Transfer and Shareholder Agreement because it violated the parole evidence rule.

Holtmeier proved the existence of a contract between the parties which was established by both oral statements and written documents made between 1981 and 1987. The Stock Transfer and Shareholder Agreement was effective January, 1984. The evidence defendants complain was erroneously admitted, evidence of statements made by defendants prior to the Stock Transfer and Shareholder Agreement, was offered by Holtmeier to prove up a disputed oral contract. The Stock Transfer and Shareholder Agreement was only one component of the contract between the parties. Where the making of an oral contract is disputed, all acts and declarations of the parties which tend to establish evidence or refute the existence of a contract, together with all the facts connected with the history of the transaction and the surrounding circumstances is admissible, if it sheds light on the purpose, meaning and intent of the parties to an oral contract. *Siedler v. Tamar Realty Co.,* 491 S.W.2d 566, 570 (Mo.App.1973); *Padgett v. Brezner,* 359 S.W.2d 416, 423 (Mo.App.1962). Holtmeier was entitled to offer any evidence which would support the existence of an oral contract between the parties. The evidence was properly admitted and, thus, this point is denied.

Defendants next assert that the trial court erred in failing to direct a verdict in favor of Elizabeth Dayani and the corporate defendants because (1) Holtmeier failed to prove that John Dayani was acting as the agent for the corporate defendants as submitted in Instruction 4, 5 and 8, and (2) Holtmeier failed to prove that John Dayani was acting as the agent for Elizabeth Dayani as submitted in Instruction 6.

Instructions 4, 5, 6 and 8 each contain the following language, except that they are specific to each of the bracketed defendants:

First, John Dayani was acting within the scope and course of his agency for defendant [Elizabeth Dayani/ANR/ANR-HHA/Medifax] at the time of the agreement. . . .

Additionally, Instruction 9 was submitted to the jury, which states:

Acts of John Dayani were within the "scope and course of agency" as that phrase is used in these instructions if:

First, the conduct of John Dayani was such that an ordinarily careful and prudent person would believe that John Dayani had authority to perform such acts on behalf of Elizabeth Dayani, American Nursing Resources, Inc., American Nursing Resources Home Health Agency, Inc., and Medifax, Inc., and

Second, Elizabeth Dayani, American Nursing Resources, Inc., American Nursing Resources Home Health Agency, Inc., and Medifax, Inc., knew or had reason to know of such conduct and allowed such conduct, and

Third, plaintiff Patricia Holtmeier reasonably relied on such conduct of John Dayani at the time of the transaction mentioned in the evidence.

■ The general rule is that a president of a corporation is empowered to transact, without special authorization from the board of directors, all acts of an ordinary nature which are incident to his office by usage or necessity and to thus bind the corporation. *Willsey v. W.C. Porter Farms Company,* 522 S.W.2d 29, 32 (Mo.App.1975). Such officer's actual authority stems from the statutes, articles of incorporation, by-laws and either specific authority from or long-standing acquiescence by the board of directors. Apparent authority is brought into existence by the principal's creation of an appearance of affairs which would cause a reasonable person to believe that the officer had actual authority to do a particular act, upon which appearance a third person relies. *Parks v. Midland Ford Tractor Company,* 416 S.W.2d 22, 26, 28 (Mo.App.1967).

In both John Dayani's and the corporate defendants' answer to Holtmeier's amended petition, they admitted that at all relevant times since the formation of the corporations John and Elizabeth Dayani were husband and wife, principal shareholders, majority stockholders, officers and directors of ANR, ANRHHA with John Dayani being president of ANR and ANRHHA. John Dayani further admitted that he was the principal shareholder, majority stockholder, officer and director of Medifax and was president of Medifax. John Dayani also testified that he was the president and chief executive officer and was in charge of the financial aspects of the companies. Kathy McNamara, the chief financial officer of the companies, also testified that John Dayani handled all the financial business for the companies. Holtmeier relied on his authority to contract with her on behalf of the defendant companies.

There was sufficient evidence to show that John Dayani had at least apparent authority to act on behalf of the companies in contracting with Holtmeier to have her move to St. Louis and open an ANR and ANRHHA office in exchange for stock interest in the companies and further that Holtmeier relied on such authority. *See Parks, supra,* at 26.

In any event, the defendant companies are estopped from denying that John Dayani did not have authority, whether actual or apparent, to contract for them. Holtmeier completely fulfilled her obligations under the contract. She moved to St. Louis, opened both an ANR and ANRHHA office and managed them into successful businesses. The corporations accepted Holtmeier's service under the contract and benefitted therefrom. They cannot now contend John Dayani had no authority to act on their behalf after they have received the service. *See Kay v. Freeman,* 785 S.W.2d 90, 93 (Mo.App.1990).

Additionally, the evidence shows that John Dayani acted as an agent for his wife, Elizabeth Dayani, in his promise to Holtmeier. Both John and Elizabeth Dayani are individually a party to the Stock Transfer and Shareholder Agreement effective January 1, 1984. This document transfers a portion of John and Elizabeth Dayani's stock to Holtmeier based specifically on John Dayani's promise to Holtmeier: that if Holtmeier would move to St. Louis, open and operate an ANR office in St. Louis, John Dayani would insure that Holtmeier receive stock interest in ANR, ANRHHA and Medifax worth a minimum of one million dollars.

Elizabeth Dayani allowed her husband to act as her agent in this endeavor in transferring her shares to Holtmeier and Holtmeier relied on this. Elizabeth Dayani is a party to the Stock Transfer and Shareholder Agreement. From the face of the document it does not appear that Elizabeth Dayani signed the Stock Transfer and Shareholder Agreement. However, she was aware of the agreement and allowed her husband to transfer her shares of stock in the companies to Holtmeier under the Stock Transfer and Shareholder Agreement.

Although Elizabeth Dayani testified at trial that she did not remember any specific conversations with anyone about her husband's promise to pay Holtmeier one million dollars for Holtmeier's interest in the companies, she did testify that she knew she had an option to purchase Holtmeier's stock. In fact, Elizabeth attempted to exercise her rights under the agreement when she notified Holtmeier of her option to purchase Holtmeier's stock. This option which she sought to exercise was in her individual capacity and not as an officer of one of the companies.

Other evidence also suggests that Elizabeth Dayani allowed her husband to act as her agent. Kathy McNamara, the financial officer for the companies, testified that she had discussions with Elizabeth Dayani concerning the million dollar promise made to Holtmeier. Elizabeth Dayani was present at the meeting with her husband, Holtmeier and Dr. Winter. This meeting concerned how the defendants would go about paying Holtmeier one million dollars for her interest in the companies. Kathy McNamara testified she had discussed the promise with Elizabeth Dayani prior to that meeting. Kathy McNamara also testified that she and Elizabeth Dayani had conversations about the let-

ter, dated December 11, 1986, in which John Dayani had written to Holtmeier outlining his plan for execution of the promise following the meeting with Dr. Winter. This letter made arrangements for Holtmeier to receive a total of one million dollars for her interest in the companies. Kathy McNamara testified that she and Elizabeth Dayani talked about the installment note and how the defendants were going to make payment to Holtmeier on the note. Kathy McNamara further testified that John Dayani always handled the financial affairs of the company and Elizabeth Dayani was not directly involved in these but was aware that her husband handled all such affairs.

■ While neither husband nor wife is empowered to act for the other merely by virtue of the marital relation, the agency of a husband for his wife may be shown by direct evidence or by facts and circumstances which will authorize a reasonable and logical inference that he was empowered to act for her or that she ratified his unauthorized acts. *Murphy v. Olds*, 508 S.W.2d 249, 253 (Mo.App. 1974). In *Murphy, supra,* even though there was no direct evidence that wife was aware of the specific partnership agreement between her husband and another to reconstruct a house and divide the profits from the sale, there was abundant circumstantial proof that she knew that her husband had an interest in its reconstruction, the couple lived in one of the houses after reconstruction, she visited the site during reconstruction, she was a signatory to the real estate contract, she executed the contract, took title to the premises in the entireties, occupied them, and reaped a benefit by receiving rental payments on them. *Id.* "All of the evidence gives rise to a fair inference that wife was appraised by her husband of the significance and purpose of the ... contract, so that her signatures were ratification and approval of the transaction her husband had arranged." *Id.* "In these circumstances, [wife] is estopped to deny [husband's] authority to act as her agent in her behalf, and is chargeable with her husband's knowledge and understanding of the ... contract ... she is bound thereby and must assume full responsibility therefor." *Id.,* quoting *Ethridge v. Perryman,* 363 S.W.2d 696, 701 (Mo.1963).

Here, evidence reveals that Elizabeth Dayani allowed her husband to act for her in the Stock Transfer and Shareholder Agreement in which a portion of her stock interest in the companies was transferred to Holtmeier. John Dayani handled all the financial affairs for the companies and Elizabeth Dayani was aware of this. She attended the meeting with her husband and Holtmeier mediated by Dr. Winter. In that meeting, the parties discussed that John Dayani, on behalf of the defendants, had promised Holtmeier at least one million dollars for her interest in the companies. This was confirmed by a letter written by John Dayani to Holtmeier outlining his plan to pay Holtmeier one million dollars for her interest. Elizabeth Dayani was aware of this letter and discussed it with the chief financial officer of the companies. Finally, she reaped the benefits of Holtmeier's reliance on the promise in that Holtmeier had fully performed her side of the agreement by moving to St. Louis, setting up and managing two profitable company offices in St. Louis and Washington, Missouri.

There was sufficient evidence for the jury to determine that Elizabeth Dayani's actions showed she allowed her husband to act as her agent and that Holtmeier relied on such. *Murphy, supra,* at 253. This point is denied.

Defendants next assert it was error for the trial court to admit certain evidence relating to payments made by defendants on the installment note because defendants contend these payments were made in furtherance of settlement negotiations.

■ As a general rule, because the law favors settlements, evidence about settlement negotiations is to be excluded at trial because such efforts should be encouraged and a party making an offer of settlement should not be penalized by revealing the offer to the jury if the negotiations fail to materialize. *Owen v. Owen,* 642 S.W.2d 410, 414 (Mo.App.1982). A valid compromise requires mutual concessions or a yielding of opposing claims. *Maugh v. Chrysler Corp.,* 818 S.W.2d 658, 660 (Mo.App.1991). An offer of compromise is made with the idea of mutual concessions. *Id.*

Prior to trial defendants made a motion in limine to exclude evidence concerning payments made to Holtmeier by defendants on the installment note. The judge reserved his ruling until the evidence was presented during trial. During trial, evidence pertaining to payments made on the installment note came in initially during Holtmeier's testimony. Defendants' failed to object to its introduction at trial. A motion in limine preserves nothing on appeal if a further record is not made. *Highway and Transportation Commission v. Vitt*, 785 S.W.2d 708, 711 (Mo.App.1990). Defendants have failed to preserve this issue for appeal by not objecting to the evidence when it was presented at trial. *Id.*

However, we will review this point in any event for plain error pursuant to Rule 84.13(c). Each of the payments defendants made on the installment note were accompanied by a letter from attorney for defendants. Each letter contained language similar to the following "as a gesture of good faith this payment should not be construed as any admission of fact or liability." Ten payments of $5,000.00 were made for a total of $50,-000.00. The first payment was made on January 1, 1989 and the last payment was made on September 22, 1989. These payments were made by the defendant companies.

Initially, we note that there is nothing in these letters that suggest mutual concession or a yielding of opposing claims. No evidence suggests that these payments were made with the understanding that Holtmeier was to do something in return, which would further a compromise or a settlement nor that she was to consider a compromise of her claim because of the installment payments. In fact, the initial letter sent to Holtmeier states that despite the fact that settlement discussion had reached a deadlock, John Dayani wanted to make the payment on the note anyway. This suggests that the payments were not a mutual concession but a unilateral decision on the part of defendants to make payment on the installment note. Defendants' action in sending the payments on the installment note did not contemplate further action on the part of Holtmeier and was not in the furtherance of settlement negotiations.

Furthermore, even if we were to view these payments as settlement offers, such evidence was still admissible. Holtmeier could have presented evidence of the payments to show that John Dayani was acting as an agent of the corporate defendants. Since these payments were made by the corporate defendants, Holtmeier could have used such relevant evidence to show that by making payments on the installment note, the corporate defendants ratified John Dayani's actions in contracting with Holtmeier.

One exception to the rule that settlement negotiations be excluded is that if an offer of settlement also constitutes an admission of an independent fact pertinent to an issue between the parties, then the offer of settlement is admissible on the trial of such issues. *Owen*, 642 S.W.2d at 414. This evidence was properly admitted. This point is denied.

Defendants next contend that the trial court erred in admitting evidence relating to the sale of ANR and ANRHHA because this evidence was incompetent, irrelevant and prejudicial.

Substantial deference is shown a decision of the trial court as to the admissibility of evidence, which will not be disturbed absent a showing of abuse of discretion. *Oldaker v. Peters*, 817 S.W.2d 245, 250 (Mo. banc 1991). The trial court abuses it discretion when its ruling is clearly against the logic of the circumstances then before the trial court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration. *Id.* The test for relevancy is whether an offered fact tends to prove or disprove a fact in issue or corroborates other relevant evidence. *Id.*

John Dayani wrote to Holtmeier concerning the sale of her stock interest, in a letter dated December 11, 1986. In explaining to Holtmeier how he foresaw the sale occurring, he outlined a three phase plan. This plan anticipated the sale or merger of the companies. He stated in the letter, "United Mis-

souri Bank ... is making a very careful and organized plan for the sell [sic] or merger of the company." Additionally, each of these three phases was conditioned on the sale or merger of the company or the sale of the assets of the company. Also, in another letter, dated May 23, 1986, John Dayani wrote to Holtmeier stating, "You as an owner have the opportunity to be able to withdraw money from the company against your ownership of up to one million dollars, which would be done as the company is mergered [sic] or sold...." Around January, 1991, John Dayani sold the assets of ANR and ANRHHA. None of the proceeds from the asset sale of ANR and ANRHHA were tendered or transferred to Holtmeier.

Considering the foregoing letters written by John Dayani to Holtmeier, she could have offered this evidence for the purpose of showing that John Dayani thought he would be able to pay Holtmeier for her interest in the stock when he was able to sell or merge the companies. Certainly evidence concerning the fact that ANR and ANRHHA had been sold or merged was relevant to the issue of whether Holtmeier's stock had been purchased subsequent to such an event. Under the circumstances, the judge did not abuse his discretion in admitting such evidence. *Cf. Oldaker, supra,* at 250–251. This point is denied.

■ Finally, defendants assert that the trial court erred in failing to enter judgment in favor of defendants John and Elizabeth Dayani on their counterclaim because the evidence established that they are entitled to specific performance of the Stock Transfer and Shareholder Agreement in that John and Elizabeth Dayani made a valid tender of the purchase price for Holtmeier's stock, Holtmeier refused to accept their tender and refused to deliver her shares of the stock, and John and Elizabeth Dayani have no adequate remedy at law.

■ Before a court will grant specific performance, the party seeking such relief must prove by clear and convincing evidence that he has performed (or tendered performance of) his portion of the contract. *Crow v. Bertran,* 725 S.W.2d 634, 636 (Mo.App. 1987). Specific performance is purely an eq-

uitable remedy and must be governed by equitable principles. *Kopp v. Franks,* 792 S.W.2d 413, 419 (Mo.App.1990). The equitable remedy of specific performance is invoked primarily that complete justice may be done between the parties, and courts of equity will not decree specific performance where it will result in injustice. *Id.* The equitable remedy of specific performance is not a matter of right but is a remedy applied by courts of equity depending upon the facts in the particular case; and the trial court has judicial discretion within the established doctrines and principles of equity to award or withhold the remedy. *Id.*

Here, the trial court properly ruled that John and Elizabeth Dayani were not entitled to specific performance. The evidence showed, as set forth above, that John Dayani, on behalf of himself and all other defendants, promised that Holtmeier would receive one million dollars for her interest in the defendant corporations. Therefore, in order for John and Elizabeth Dayani to be entitled to specific performance, they must have tendered (or have been ready to tender) one million dollars at the time they requested Holtmeier tender her stock certificates to them.

John Dayani testified at trial that at no time did he ever tender one million dollars to Holtmeier and that he had no intention of doing so. Holtmeier had completely and satisfactorily performed her portion of the contract. An injustice would have resulted had the trial court ordered her to tender her stock where she had fully performed her end of the bargain and where John and Elizabeth Dayani had not tendered and were unwilling to tender the agreed upon price. *Kopp, supra,* at 419; *see also Seabaugh v. Keele,* 775 S.W.2d 205, 207 (Mo.App.1989).

The trial court properly denied the Dayani's counterclaim for specific performance. We do, however, note that the trial court's judgment speaks nothing of Holtmeier's obligation to tender the stock, only of the defendants' obligation to tender the jury award to Holtmeier. We, therefore, modify the judgment and order Holtmeier tender the stock upon her receipt of $950,000.00 in accordance

with the jury award and payment of prejudgment interest as we have determined below to be applicable. Defendants' point is denied; however, the judgment is to be modified in accordance with this directive.

### HOLTMEIER'S CROSS–APPEAL

Holtmeier cross-appeals contending the trial court erred in failing to grant her motion for additur because she prayed for interest in her petition, the damages were liquidated and she was entitled to interest as a matter of law.

Section 408.020 RSMo 1986 states, in part, "Creditors shall be allowed to receive interest at the rate of nine percent per annum, when no other rate is agreed upon, for all moneys after they become due and payable, on written contracts, and on accounts after they become due and demand of payment is made...."

In *Schnucks Markets, Inc. v. Cassilly,* 724 S.W.2d 664 (Mo.App.1987), Schnucks brought an action against a partnership for breach of an oral contract. The court entered judgment for Schnucks but failed to award prejudgment interest. Schnucks cross-appealed contending the trial court erred in failing to include language in the damage instruction which included the allowance for interest. The trial court had refused to allow such language believing Section 408.020 did not apply to an oral contract. *Id.* at 668. However, relying on *Burger v. Wood,* 446 S.W.2d 436 (Mo.App.1969), this court determined that the trial court in *Schnucks* misread the statute as forbidding the awarding of interest when there is an oral contract. *Schnucks, supra,* at 668.

In *Burger,* a contractor sued a homeowner for payment for paving the defendant's driveway. The court there said that the judgment was for an account where the contract price is agreed upon, and thus prejudgment interest should have been awarded. This was because, according to Section 408.020, an "account" is regarded as equivalent to a claim on demand. *Burger,* 446 S.W.2d at 443. Thus, here, as in *Schnucks* and *Burger,* Holtmeier's action falls within the purview of Section 408.020 RSMo 1986. However, in order for interest to be awarded, Holtmeier's claim must be liquidated and she must have petitioned for it.

The law in Missouri will not allow prejudgment interest on unliquidated claims as the debtor is unaware of the amount he owes. *Schnucks, supra,* at 668. In order for a claim to be liquidated so as to allow interest, the claim must be fixed and determined or readily determinable, but it is sufficient if it is ascertainable by computation. *Id.*

Here, the evidence revealed that John Dayani promised Holtmeier one million dollars for her stock interest in the companies if she would move to St. Louis and open an ANR office in St. Louis. Two notes were presented to John Dayani—one for a lump sum of $500,000.00 and one for $500,000.00 to be paid in installments for payment of her one million dollar stock interest. John Dayani signed only the installment note. The defendants made ten installment payments to Holtmeier totaling $50,000.00. Holtmeier demanded payment of the remainder of her stock interest on January 1, 1989, but defendants failed to act. The damages are readily ascertainable and therefore liquidated. *Schnucks, supra,* at 668.

Furthermore, Holtmeier properly petitioned for interest. The allowance of prejudgment interest is not dependent on an express petition allegation seeking such relief. *Addison v. Jester,* 758 S.W.2d 454, 460 (Mo.App.1988). In *Haynes v. Allen,* 482 S.W.2d 85, 89 (Mo.App.1972) and *General Aggregate Corp. v. LaBrayere,* 666 S.W.2d 901, 910 (Mo.App.1984), this court held a petition which prayed the court "to grant such other and further relief as the court may deem meet and proper in the premises", and "such other relief as may be proper under the premises" to be sufficient to authorize the award of prejudgment interest on a debt. It is not necessary for evidence to be presented or for a jury to be instructed on the subject where prejudgment interest is only a matter of mathematical computation. *Addison, supra,* at 460. Holtmeier, in her petition, pleaded "plaintiff prays judgment against defendants and each of them in an amount reasonably likely to compensate her for the damages she has sustained ... to-

*gether with her interest...."* (Emphasis added.) Clearly, interest was sufficiently pleaded by Holtmeier.

■ Holtmeier's claim comes under the purview of Section 408.020, her claim is liquidated and she petitioned for interest. However, the trial court declined to award interest. In *California & Hawaiian Sugar v. Kansas City Terminal Warehouse Co.*, 788 F.2d 1331, 1335 (8th Cir.1986), relying on *Slay Warehousing Co. v. Reliance Insurance Co.*, 489 F.2d 214, 215 (8th Cir.1974), the court stated, "[T]he award of prejudgment interest in a case in which [s]ection 408.020 is applicable is not a matter of court discretion; it is compelled." Accordingly, the trial court erred in denying Holtmeier prejudgment interest. This point is reversed and remanded with instructions to the trial court to enter judgment for Holtmeier with prejudgment interest, as provided in Section 408.020 RSMo 1986, running from January 1, 1989.

The judgment is affirmed in all respects except that we reverse and remand with instructions for the trial court to enter judgment for Holtmeier with prejudgment interest running from January 1, 1989, and modify the judgment to require Holtmeier tender her stock interest upon tender of the jury award and prejudgment interest by defendants in accordance with this opinion.

Judgment affirmed in part, reversed in part and remanded with instructions and modified in part.

GARY M. GAERTNER, C.J., and SMITH, J., concur.